NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY v.
WILLIAM GEORGE and Others.

July 25, 1899.

Nos. 11,668—(209).

| 77 | 319 |
| 82 | 491 |

### Mortgage—Cold-Storage Plant—Removal of Apparatus.

A building, subject to a mortgage as part of the real estate, being constructed and used for cold-storage purposes, the natural system of refrigeration being in use, the owner or mortgagor in possession made a contract (to which the mortgagee was not a party) with H., by which the latter was to put, and did put, into the building, for an agreed price of over $12,000, a plant or apparatus for a system of artificial refrigeration; the same to remain the personal property of H., and the title not to pass until paid for. In putting in the new apparatus, the drip pans and cold-air pipes used in connection with the old natural system of refrigeration were removed, and certain other minor changes made in the building. All the apparatus pertaining to the new artificial system of refrigeration can be removed without material injury to the building or the apparatus, but, if removed, the building cannot be used for cold-storage purposes without putting in another apparatus for artificial refrigeration, or restoring the old natural system. The latter could be done at a cost of $1,700 or $1,800. But the artificial systems of refrigeration are more satisfactory than the natural system, and are coming into general use, to the exclusion of the natural system formerly in use in the building. If the present apparatus should be taken out, the building would be in condition for putting in another like system, or, with certain necessary changes (the extent of which does not appear), any other mechanical system for refrigerating. In view of these facts, it does not appear, and there is no finding, that, if the present apparatus should be removed, the building would be worth any less for cold-storage purposes than it would have been had the changes never been made, and the natural system remained intact. The apparatus has not been paid for. *Held*, that the trial court was right in holding, as between the mortgagee and H., or assigns, that the apparatus for artificial refrigeration did not become a part of the realty, or subject to the lien of the mortgage, but might be removed.

Action in the district court for Ramsey county to enjoin defendants from removing a refrigerating plant from a building covered by plaintiff's mortgage. The case was tried before Brill, J., who

found in favor of defendants; and from an order denying a motion for a new trial, plaintiff appealed. Affirmed.

*Edmund S. Durment*, for appellant.

*Morphy, Ewing & Gilbert* and *Theodore Worcester*, for respondents.

BUCK, J.

On October 6, 1892, one William H. Patterson was the owner of the real estate described in the complaint, and in the possession thereof, and he then borrowed of this plaintiff $50,000, and promised to repay plaintiff the same on October 6, 1897, with interest thereon at the rate of 5½ per cent. per annum; and, to secure the payment of said principal sum and interest, he then duly executed a mortgage to plaintiff on said premises, which mortgage was on October 10, 1892, duly recorded in the office of the register of deeds of Ramsey county, wherein said premises are situate. On said last-named day, Patterson duly conveyed said real estate to the Thurston Cold Storage Company, subject to said mortgage; and said company forthwith went into possession of said premises, and continued in possession thereof until the year 1897, when it became insolvent, and made an assignment of all its property for the benefit of its creditors, and it has been ever since, and still is, insolvent.

At the time of making said loan and the execution of said mortgage there was, and at all times since there has been, situated upon said real estate, a large brick building, which had been built and arranged to be used as a cold-storage warehouse, and which then and now constitutes a considerable part of the value of said premises, and, if not used for the purposes of a cold-storage warehouse, is of considerably less value than if so used. At and prior to the execution of said mortgage the business of cold storage was carried on in said building under the natural system of refrigeration, and said building was arranged so that the cold air necessary to keep the temperature in the various rooms in said building at the proper stage was largely furnished from natural ice stored in the upper part of said building, and the air was conducted to various portions of said building through certain flues built in or upon the walls of said building, and extending through the floors, and in some part was furnished by packing ice and salt in flues or tubes

built in said building for that purpose. Shortly after the execution of said mortgage, and in the fall and winter of 1892, the Thurston Company changed a portion of said building from the natural to an artificial system of refrigeration, known as the "brine system," in which cold is generated by means of machinery consisting of an engine, compressor, tank, and pipes, and the use of ammonia and brine forced through pipes into coils placed in rooms where needed; and in making said change the Thurston Company placed in said building appropriate machinery, called a "Fifteen-ton plant." Thereafter the business of said cold storage was carried on in said building by the Thurston Company partly by the natural and partly by the artificial system of refrigeration, until the installation of the 60-ton apparatus now in controversy.

It appeared that on March 22, 1895, the Hercules Ice-Machine Company made an agreement in writing with the Thurston Company whereby the former company would construct for and deliver to the latter company on said premises by May 1, 1895, a complete 60-ton refrigerating apparatus, for the sum of $12,327, payable in various sums and at different intervals,—the first payment due January 10, 1896, and the last one due January 10, 1898,—evidenced by several notes. This agreement provided that the title and ownership of the 60-ton plant and its appurtenances should remain in the Hercules Ice-Machine Company until paid for; nor was the title to said plant to vest in the Thurston Company until the apparatus proved satisfactory to the latter company, nor until it accepted said apparatus or plant. Pursuant to said agreement, the Hercules Company furnished and put into said building said 60-ton refrigerating apparatus, the work upon the same being closed some time later than May 1, 1895 (the exact time not appearing); and said Thurston Company, at the request of said Hercules Company, executed and delivered to it the notes provided for in the agreement,— a portion of them prior to, and a portion after, May 1, 1895. None of said notes, nor the purchase price of said apparatus, was ever paid. On April 27, 1895, the Hercules Company, for value, executed and delivered to the Old Second National Bank of Aurora, Illinois, all its interest in said agreement, including sums due and to become due, and the notes given for the purchase price of said machinery,

including the right to remove said apparatus or machinery from said building in case of default of payment on the part of said Thurston Company, as provided in said agreement. Subsequently, and on March 18, 1896, said bank, for value, executed and delivered to the defendant William George all its rights in said agreement and the money due or to become due thereon, and the purchase-money notes, and the right to remove said machinery as provided in said contract.

. Thereafter, and in March, 1896, the defendant William George entered into an agreement with the Thurston Cold-Storage Warehouse Company, wherein was recited the fact that said Hercules Ice-Machine Company had placed this 60-ton refrigerating plant in said warehouse building, and that said Thurston Company had given notes therefor, and that no part thereof had been paid, and that said Thurston Company had never accepted said refrigerating plant, and had paid no consideration therefor, and that said George had purchased all of said Hercules Company's rights in said contract and plant, and was the owner of said notes, and that differences and controversies relating to the performance of said contract by the Hercules Ice-Machine Company and the Thurston Company had arisen; and whereas, it was understood that the title of said refrigerating Ice-Machine Company had never been devested out of the Hercules Ice-Machine Company or its assignees by virtue of anything done under said original agreement, it was therefore agreed that said George lease to said Thurston Company the said 60-ton plant for the term of two years from May 1, 1896, to be used by it as a refrigerating plant in said cold-storage building, and not elsewhere, for a rental of $75 per month, with the privilege on the part of the Thurston Company, on or before the termination of said lease, of purchasing said plant by paying therefor the sum of $9,663.50, for which three notes were given, payable on or before May 1, 1898, with interest from May 1, 1896. The lease also contained a provision that, if there was a default in the rental payments, the lessor might enter upon the premises and take full and absolute possession of said refrigerating plant and machinery, and remove the same, and that title and ownership should remain in said George until the agreement was consummated by the purchase of said

plant. This agreement was filed in the office of the city clerk of the city of St. Paul April 25, 1896.

Upon this agreement or lease the Thurston Company paid rental to the amount of $675, and no more, and no part of the three notes has been paid. The defendant George, by reason of the default in the terms of the lease, commenced an action of claim and delivery to recover the 60-ton plant, but before doing so tendered to the Thurston Company and to the St. Paul Cold-Storage & Warehouse Company said notes; the latter company having succeeded to all the former's rights in and to said plant, and being in possession of and operating the same.

As George was claiming title to the 60-ton plant put in by the Hercules Company, and was about to remove the same, the plaintiff, as mortgagee, brought this action to restrain such removal, and to have its mortgage adjudged a lien thereon. The contest is really between plaintiff and the defendant George; the latter claiming that he had acquired rights under the Hercules Company contract, which gave him title to the plant, and that, as there was default in the contract or lease made by him with the Thurston Company, he had a right to recover and retain possession of the property as his own, and also that the natural ice system of refrigeration had become obsolete. On trial the court decided in his favor, and adversely to that of plaintiff.

The mortgagor is insolvent, and the security inadequate, either with or without the machinery. Exclusive of the machinery, the value of the building at the commencement of this action was $25,-000. The appellant contends that the Hercules contract was a chattel mortgage; and the respondent contends that it was a conditional sale, and that under its terms, and the subsequent assignment to the bank, and by it to George, the latter had the right to remove the machinery without the consent of the mortgagee. We agree with the contention of the respondent that it was a conditional sale, and that the title to the machinery did not pass to the Thurston Company under the agreement.

One of the rules for determining whether a contract is a conditional sale is the intent of the parties, and another rule is this: When the vendor is to do anything to the property in order to put

it into the state in which the vendee is bound to accept it, the doing of that thing is a condition precedent to the vesting of the property. Anderson, Law Dict. 19. It is seldom that a contract comes so clearly within the definition of what constitutes a conditional sale as the one at bar. (1) It was expressly agreed that the title and ownership of the apparatus and appurtenances should remain in the Hercules Ice-Machine Company until each payment was fully made, and the giving of notes was not to be deemed payment, until they were actually paid. (2) The Hercules Company guarantied that the machinery and apparatus would accomplish certain results set forth in the specifications forming part of the contract, and the Thurston Company was not to accept the machinery until such results were accomplished. (3) The results guarantied and contemplated by both parties were never accomplished to the satisfaction of the Thurston Company, and it never accepted the machinery and never paid for it.

It would be difficult to find another contract so lacking in the essential elements which constitute the passing of the title. There was no intent that the title should be considered as passed under these conditions, and none did pass; and, to hold otherwise, we should be making a contract for the parties never contemplated by them, and not warranted by the facts. In other words, this court would thus be passing title to the property, when each party had expressly agreed that it had not passed. Nor did any title to the machinery pass to the St. Paul Cold-Storage & Warehouse Company by virtue of the lease or contract made by it with the defendant George. This instrument was in part a lease, and in part a contract to sell in the future on certain conditions. It was not a sale in præsenti, to be completed or defeated by the performance or nonperformance of certain conditions; but a mere agreement to sell in the future, upon certain conditions, none of which were performed. This agreement to sell in the future did not pass any title at the time when it was made, and certainly none passed afterwards; and the St. Paul Cold-Storage & Warehouse Company, as owner of the building, had no conveyable title in the machinery, so as to render it subject to the lien of the plaintiff's mortgage, and thus defeat the rights of the defendant George in such machinery,

and it could have no such title to vest in another until it had performed the conditions of the agreement with George.

The title to the property, then, not having been devested by the terms of the contract, nor by the performance of the terms thereof, as between the parties, the question arises as to the rights of the plaintiff mortgagee as against the rights of the defendant George, the assignee of the rights of the Hercules Ice-Machine Company. Appellant claims that George cannot legally remove the machinery without consent of the mortgagee. Why not? It was not there when plaintiff loaned its money and took security on the premises for its repayment. It was not there when the 15-ton plant was installed in place of the natural refrigerating system. It was not installed in the building until several years after the date of the mortgagee's loan on the premises. It parted with no security or consideration on the faith that this 60-ton plant would be installed or remain there. It is not an innocent holder of a mortgage, taken without notice, upon land to which the owner had affixed property, personal in its character, before the execution of the mortgage. It has no equities which it can invoke in its favor, for the installation of the 15-ton plant added materially to the value of the security which it took when it loaned the money to Patterson in the first instance.

The question, then, is purely one of law, viz., which has the superior rights, the plaintiff or the defendant George? At the time the 60-ton plant was installed in the building, the Thurston Company owned the premises, and by the terms of the contract the Hercules Company reserved the right to remove the machinery in case of nonpayment of the purchase money. There is no pretense that such money has been paid, and there is no contention but that the Thurston Company agreed that the Hercules Company might remove the property in case of nonpayment of the purchase price of the machinery. In the case of Merchants Nat. Bank v. Stanton, 55 Minn. 211, 56 N. W. 821, this court held that, where buildings are erected by one having no interest in the land on which they stand, an agreement will be implied that the buildings shall remain the personal property of him who erects them,—especially in the absence of any other facts or circumstances tending to show a dif-

ferent intention,—and .that, where the land is subject to a mort-gage, if the agreement of the mortgagor in possession and the party erecting the building was that it should remain the personal prop-. erty of the latter, the absence of a concurrent agreement on the part of the mortgagee to the same effect will not, of itself, make the building a part of the mortgage security. It seems to us that the rule here laid down controls the case at bar. There can be no material distinctions between a building apparently affixed to the land, and that of a refrigerating plant so affixed.

The description of the component parts of the machinery, and the manner in which it is affixed to the building, is too lengthy to be inserted in this opinion. The change by installing the 60-ton plant was made, in addition to the 15-ton plant, which had supplanted the natural ice system, and proved to be much more satisfactory and valuable, and to such an extent that it was deemed advisable to further increase the refrigerating facilities and capacity of the building by the addition of the 60-ton plant. Upon the evidence the trial court found that

"The artificial system of refrigeration is more satisfactory than the natural system, in the business of cold storage, and the use of apparatus like that in controversy, or somewhat similar, is becoming general, to the exclusion of the system formerly used in said building."

While, if the 60-ton apparatus is removed, the part of said building operated by means of it cannot be used as a cold-storage warehouse without putting in other apparatus, or restoring the old system of refrigeration, yet, if the 60-ton plant is properly taken out, any other of the mechanical systems for refrigerating could be installed in the building, with such changes as might be necessary to adapt it to the other systems, at an expense of $1,700 or $1,800. The 60-ton and 15-ton apparatus are of the same character, and operate the same way, and the removal of the former would not materially injure the building for the 15-ton plant. But we are satisfied from an examination of the record that the natural system of refrigeration, as operated in this building, was not satisfactory, even if not a failure; and it is reasonable to infer that in no event would it again be resorted to as a successful system, or one benefi-

cial in its financial results. However this may be, the Hercules Ice-Machine Company had no hand in making the original change from the natural ice system to the 15-ton system, and it laid out nothing in the acquisition of the 60-ton system, nor even in the 15-ton system, which alone is much more valuable than the natural ice system, which alone existed when plaintiff made its loan and took the mortgage security on the building. The plaintiff is not the owner of the building, or the property upon which it is situate. It is simply a mortgagee out of possession, and was never misled, and advanced no consideration on the strength of the machinery becoming a part of the realty, which the trial court found did not become so.

Our conclusion is that the order should be affirmed. So ordered.

MITCHELL, J.

I concur in the result. It must be admitted, as established facts in this case, that the 60-ton plant for the artificial system of refrigeration was put in as a substitute for the natural system previously in use in conjunction with the 15-ton artificial plant; that in making this change the drip pans and cold-air ducts or flues used in connection with the natural system of refrigeration had been removed, and certain other minor changes made in the building, which, however, largely increased its storage capacity; also, that, as this building was constructed and is especially adapted for cold-storage purposes, it will be necessary, for its beneficial use, to put in another system of refrigeration in case the 60-ton plant is removed. But the findings of the court, justified by the evidence, are:

"All apparatus pertaining to said 60-ton plant can be removed without material injury to the building or the apparatus." Also: "If said 60-ton apparatus is removed, the part of said building operated by means of it cannot be used as a cold-storage warehouse without putting in other apparatus, or restoring the old system of natural refrigeration." If the 60-ton apparatus were properly taken out, any other of the mechanical systems for refrigerating could be installed in the building, with such changes as might be necessary to adapt it to the other system; it appearing that no other system is precisely like this. "Said building can be restored to the same condition in which it was before said changes were made to accommodate said 60-ton apparatus, at a cost of $1,700 or $1,800. The

artificial system of refrigeration is more satisfactory than the natural system, in the business of cold storage; and the use of apparatus like that in controversy, or somewhat similar, is becoming general, to the exclusion of the system formerly used in said building."

It will be observed that, while the court finds that it would cost $1,700 or $1,800 to restore the building to the same condition in which it was before the changes were made to accommodate the 60-ton apparatus (that is, to refit the building for the old natural system of refrigeration), there is no finding that the building with the 60-ton apparatus removed will be worth one dollar less than it would have been if the changes had never been made, and the old natural system of refrigeration had been continued. In fact, it is fairly implied by the findings that an artificial system is so much more satisfactory than the natural system of refrigeration, and is coming into such general use, to the exclusion of the natural system, that the building, with the 60-ton plant removed, will be worth as much for cold-storage purposes as it would have been had it remained unchanged, with the natural system intact. Upon this state of facts, the court was right in holding that as between the plaintiff and the defendant George, or those under whom he claims, the 60-ton plant did not become a part of the realty, and is not subject to the lien of plaintiff's mortgage.

CANTY, J.

I concur with Justice MITCHELL, as far as his opinion goes, but would add something more. The new refrigerator plant is so wholly and radically different from the old, and there is such a total want of identity or similarity between the two plants or any of the different parts of each, that the new plant cannot be considered as a mere substitute for the old, so that the plaintiff's mortgage would attach to the new plant as such substitute.