This is an action in replevin. There was a verdict and judgment in favor of plaintiff that it was entitled to the possession of the property, the value of which was fixed at $1447, and that plaintiff recover the sum of $615 for the unlawful retention of the same. Defendant has appealed.
The facts show that on or about April 22, 1927, the McCanless Building Company gave a real estate mortgage to the defendant upon a kitchenette apartment building, in Kansas City, to secure an indebtedness of $75,000 due from the former to it; that the mortgage was duly recorded and, thereafter, the McCanless Building Company sold the building to Christenson Company; that while the latter was the owner of the building, and on September 21, 1928, it purchased *Page 834 
of the R.E. Parsons Electric Company the property which is the subject of this litigation, being two Frigidaire Compressors, thirty-two Frigadaire Cooling Coils and thirty-two Frigidaire Refrigerators, for the price and sum of $3282.30, which was to be installed in the building by the Parsons Company. Although defendant's mortgage had not been paid it was not informed, through any agent authorized to received the information, of the purchase or installation of the refrigerator system. The purchase was made under a conditional sales contract, providing for the payment of $377.46 in cash by Christenson Company and the balance, together with the financing charges, in twenty-four monthly installments, "to be evidenced by chattel mortgage or conditional sales agreement which purchaser agrees to execute upon request." No other conditional sales agreement was ever executed. The conditional sales contract further provided:
"Title to said goods shall remain in the seller until the purchase price thereof is paid in full in cash. Upon full performance and observance by the purchaser of all the terms and conditions hereof at the time specified therefor, title to said goods shall without any further action on the part of the seller be transferred and vested in the purchaser.
 . . . . . .
"The Frigadaire shall remain chattel property and shall be connected with any pipes, tubing or conduit built into the building only by a coupling which screws on and off and shall not be attached to or built into any part of the building or to any frame work in such manner as to interfere with ready inspection, service, repair, removal or replacement."
It also provided:
"NOTE: — Seller agrees to install above equipment in building hereinafter mentioned and to build into said building conduits or tubing necessary for use in connection therewith, which conduits and tubing shall become a part of building and are not any part of goods to which title is retained."
The evidence shows that the tubing, bolts and fittings were figured as one item, and the compressors, coils and refrigerators as a separate item. However, the work of installing both items was, under the provisions of the contract, to be done by the R.E. Parsons Electric Company "on the basis of a complete job" — what is known as a "Turnkey" job. All of the installations "were a part of that complete job."
The work was completed on the 16th day of October, 1928, by the R.E. Parsons Electric Company and, on that day after the work was finished, Christenson Company gave to that company a chattel mortgage upon the compressors, coils and refrigerators in question, for the deferred payment due upon them, amounting to $2904.84. This mortgage was duly assigned to the plaintiff. It recites:
"The property may remain in possession of the mortgagor as long *Page 835 
as the conditions of this mortgage are fulfilled and shall remain strictly personal property whether placed upon a permanent foundation or in what manner affixed or attached to the building or structure in which it may be contained."
After the installation of the equipment default was made in the performance of the conditions in the real estate mortgage and the building was taken over by the defendant as mortgagee. Default was also made in the payments to be made under the chattel mortgage and, thereafter, demand was properly made by plaintiff for the balance due, which demand was refused, and this suit was brought. The chattel mortgage was not recorded until three days after its execution and the conditional sales contract was never recorded.
At the time the contract for the installation of the property in suit was executed, the apartments in the building were equipped with ice boxes and in doing the work the R.E. Parsons Electric Company took out these boxes and stored them in the basement.
The new equipment was installed as follows: A concrete base for the compressors was constructed in one corner of the basement of the building and became permanently attached. A one-inch cork board was placed on this base and the compressors were placed on this board but not attached to it or the base in any manner. The power for the compressors was furnished by electricity. The wires were run from the meter where the power lines entered the building, thence along the walls and were permanently affixed thereto and to the ceiling of the basement. They then ran to a point near the compressors where they entered two "Square D" switch and fuse boxes and two "starters," all attached to the wall. They then ran to the compressor where they were attached to the motors of the compressors by splicing them to the wires of the motors.
The compressors were water cooled, the water being supplied through a pipe which was attached to the water line in the building. This pipe was fastened to the wall and ran to a point near the compressors. It was then connected to the compressors by a piece of hose some twelve or eighteen inches long. This hose was held in place by clamps which could be loosened or tightened by a screw. The water was discharged from the compressors into a waste pipe which was connected to the compressors in the same manner as was the piping conveying it thereto. This waste pipe was fastened to the wall and ran to a soil or sewer pipe into which it screwed or to which it was attached by a union. Attached to the compressors were three copper tubes, one a small supply line and the others two larger return lines, through which the refrigerant solution was circulated between the compressors and the various refrigerators throughout the building. These tubes are permanent equipment and, under the provisions of the purchase contract, they were to become a part of the building. They were attached to the compressors by flare nuts which could be *Page 836 
easily unscrewed. They ran up the basement wall and back through the building along the ceiling. The tubes were attached to the walls and ceiling by "U" shaped pieces of metal, each end of which was screwed or nailed to the wall or ceiling. At intervals along the ceiling branch lines of the tubing were taken off the main line and run up through holes cut in the basement ceiling and the floor above it. In a few instances these branch lines were run through partitions to the height of the service doors in the partitions on the first floor of the building and were taken out of the partitions through holes cut in the frame work of these doors. In other instances the branch lines and tubing from the basement were not run inside of the partitions even to the first floor. The tubing ran from the first to the upper floors, not through the partitions, but through holes cut in the kitchen cabinet shelves above the refrigerators and through holes cut in the ceiling of the floor immediately above. On each floor of the building the tubing was fastened to the mop board where the tubing came through the floor. Behind each refrigerator there was a "T" connection in the line of tubing and two short copper tubes, one a half inch and the other a quarter of an inch in diameter, ran from this connection through a hole in the back of the refrigerators and the two tubes were connected with the cooling coils inside the refrigerators by flare nuts, which could be easily unscrewed. In this coil the refrigerant evaporates and the refrigeration takes place.
As before stated, prior to the installation of the automatic refrigeration system, refrigeration was by means of ice and ice boxes in the kitchen of the various apartments; the ice was placed in the various refrigerators from the public hallways of the building through the small service doors above mentioned; these doorways, which are about waist high and approximately two and one-half or three feet square, were finished and trimmed as were the other openings in the building.
Defendant's witnesses testified to the effect that notches were cut in the framework of various service doors in instances where the tubing did not come out of the partitions through holes cut in the frames. These notches were cut to provide recesses through which the tubing could run up behind the refrigerators and past these doors. These notches were described as being two inches deep.
The old ice boxes in the various kitchens sat on the floor in recesses left in the built in cabinets, and in front of these recesses and refrigerators (as viewed from inside the kitchen) there were cabinet doors. When the system was installed these ice boxes were removed from the recesses and the "Automatic Refrigerators" (in each of which there was a cooling coil) were placed in the recesses.
There was evidence that the new refrigerators were shorter in height than the old boxes; that they were not placed upon the floor but each was set on two-by-fours which were nailed to the sides of the recesses above the floor. However, plaintiff's evidence tends to show *Page 837 
that no carpenter work of any kind was done in connection with the installation of the system. There was testimony, disputed by a witness for plaintiff, that in order to put some of the new refrigerators in place the R.E. Parsons Electric Company sawed out a part of the cabinet work which had been around the recesses; that in some instances the opening or face of the recesses was substantially larger than the new refrigerators and that in these instances, in order to give a neater and more finished appearance, strips or shims were nailed to the edge of the cabinet framework in order to fill the space between the new refrigerator and the frame. If these refrigerators were to be removed these strips would be required to be torn out.
Defendant's testimony in regard to the condition in which the building would be left if the compressors, refrigerators and coils should be removed was to the effect that the facing of the cabinets around the recesses in which the old ice boxes stood, would in about nine out of ten cases, be sawed off; that there would be the two-by-fours on which the automatic refrigerators rest, nailed inside these recesses to the sides of the cabinets; that millwork of service doors would be left with holes in it and there would be dead ends of the copper tubing protruding through the holes in such framework; that there would be the raw exposed copper tubing running up through the kitchen cabinets, and the cabinet shelving would have holes in it as would the ceilings and floors; that in the basement there would be the lines of tubing along the ceiling and wall; that there also would be the water supply and waste pipes and the electric wires; that if the compressors were removed the live wires would have to be taken care of; that there would be left the concrete bases and that the pipe which carries waste water from the compressors into the soil pipe would have to be plugged to avoid an unsanitary condition.
There was also evidence on the part of the defendant that by reason of the installation of this frigidaire system and the subsequent removal of the compressors, coils and refrigerators, the market value of the property would be depreciated from $1000 to $1500.
Plaintiff's evidence tends to show that there would be no defacing of the woodwork in the building by the removal of the compressors, coils and refrigerators and that the building would be left in the same situation as it was before the work was done, with the exception that all of the equipment, except the compressors, coils and refrigerators, would be in place. Of course, the old ice boxes could be reinstalled easily. Its evidence also shows that the compressors, coils and refrigerators could be easily removed without damage to the building. The compressors could be taken out by being disconnected from the copper tubing by the simple method of unscrewing the flange nuts and by cutting or disconnecting the wires, removing the screws and taking out the clamps from the hose connections; that no part of the building or the kitchen cabinets were torn away or taken out with the *Page 838 
old ice boxes, nor was any of the framework cut when the new refrigerators were placed in the building; that the building, itself, was enhanced in value by the installation of the electric refrigeration, tubing and other equipment which was not covered by the chattel mortgage; that this tubing and equipment could be used in installing other refrigeration equipment.
Defendant's evidence tends to show that electric refrigeration is beneficial and valuable in apartment buildings such as this and that it increases the rental value, but that it would be impractical to use the tubing and other equipment remaining after the taking out of the compressors, coils and refrigerators, for any purpose.
It is insisted by the defendant that the court erred in refusing to sustain its demurrer to the evidence; that that part of the equipment sued for, to-wit: the compressors, coils and refrigerators, so far as the defendant is concerned, became fixtures and a part of the real estate upon their installation. We think there is no merit in this contention. In a case of this kind an agreement by the owner of the land, in favor of the owner of an article, to the effect that the article shall retain its personal character or be removable as personalty, even though affixed to the land, unless it becomes so builded into the structure as to become an essential part thereof, is valid and effective against the owner of the realty and precludes him from contending that the article has become a part of the realty by virtue of the fact that it has become affixed thereto, unless its removal will destroy or necessarily impair the value of the article. As to a prior mortgagee of the building, in relation to the party installing the article he stands in the same position as the owner, except that the article does not retain its characteristic as personalty, if to remove it would materially damage the structure or impair the security of the mortgage. [Patton v. Phoenix Brick Co., 167 Mo. App. 8; Wolf Co. v. Bank,168 Mo. App. 549; Holtgreve v. Sobolewski, 31 S.W.2d 993; Binkley v. Forkner, 117 Ind. 176; Southwestern P.S. Co. v. Smith (Tex.), 31 S.W.2d 472; Commercial Credit Co. v. Gould (Mass.),175 N.E. 264; Stiebel v. Beaudette Graham Co. (Mass.),175 N.E. 267; Workingmen's B. L. Assn. v. Smith (N.J.), 155 A. 20; Northwestern Mutual Life Ins. Co. v. George, 77 Minn. 319; Mfgs. B. L. Assn. v. Public Service Elec. Co. (N.J.), 150 A. 196; Shippen v. Georgia Power Co. (Ga.), 159 S.E. 268.] The law in this State is well stated in the case of Patton v. Phoenix Brick Co., supra, l.c. 12, 13, as follows:
"The general rule is that whatever is annexed to the freehold becomes a part of it. But it is truly said that the diversity of trade required some relaxation of the rule, so that now it is conceded that `the nature of the articles, and the manner in which they are affixed, and the intention of the party making the annexation, together with the policy of the law, are controlling factors in determining whether *Page 839 
an article, which may or may not be a fixture, becomes a part of the realty by being annexed to the freehold. The purpose or intention of the parties, the effect and mode of annexation, and the public policy in relation thereto, are all to be considered. When the parties immediately concerned, by agreement between themselves, manifest their purpose that the property, although it is annexed to the soil, shall retain its character as personalty, then, except as against persons who occupy the relation ofinnocent purchasers without notice, the intention of the parties will prevail, unless the property be of such a nature that it necessarily becomes incorporated into and a part of the realty by the act and manner of annexation. Thus if, in the course of constructing a house, brick should be placed in the walls, and joists and beams in their proper places, the brickmaker and sawyer would not be permitted to despoil the house by asserting an agreement with the owner that the brick and beams were to retain their character as personalty, notwithstanding their annexation. In such a case the mental attitude of the parties cannot modify the legal effect resulting from the annexation. But when chattels are of such a character as to retain their identity and distinctive characteristics after the annexation, and do not thereby become an essential part of the building, so that the removal of the chattels will not materially injure the building, or destroy or unnecessarily impair the value of the chattel, a mutual agreement in respect to the manner in which the chattel shall be regarded after annexation will have the effect to preserve the personal character of the property between the parties to the agreement. Accordingly, the proposition is well sustained that one who purchases machinery with a view that it shall be annexed to or placed in a building of which he is the owner, and who executes a chattel mortgage on the property so purchased, thereby evinces his intention that the property shall retain its character as personalty, regardless of the manner in which it may be annexed to the freehold."
In the case at bar the evidence, taken in its most favorable light to the plaintiff, shows that if the equipment in suit were removed it would not injure it nor would the building be left with an appreciable change or alteration, but it would retain the same value that it had at the time of the installation. [Wolf v. Bank, supra, l.c. 553.]
It is insisted that the entire system, including the parts in suit, were furnished and installed under one contract and were essentially parts of a complete refrigeration system and, as the other parts, such as the tubing conveying the refrigerant from the compressors to the refrigerators, the concrete base for the compressors, the electric wires and the plumbing became a part of the real estate, the whole system, including the items in suit, likewise became a part. Defendant admits that had Christenson Company installed the tubing and the other accessories to the machinery sued for and then entered into the contract with the R.E. Parsons Electric Company for the equipment *Page 840 
sued for, under an agreement that that equipment should remain chattels or personalty, there would be a different situation presented. But it says that, as the entire system was installed under one contract by the same person, it must be considered as a whole and that it cannot be divided up so as to say that part of it is personalty and the rest realty.
We think that a distinction is attempted to be made where there is no substantial difference. The parties to the contract stipulated that the compressors, coils and refrigerators should remain personalty while the rest of the equipment should become real estate. We know of no good reason, legal or otherwise, why they could not enter into such a valid stipulation and, as before stated, defendant's rights are no greater than those of Christenson Company, except if the removal of the personalty, that is, the compressors, coils and refrigerators would materially injure the security for defendant's mortgage they will be considered as a part of the realty as to it. Plaintiff's evidence tends to show that what would be left, if the equipment in suit were removed, would enhance the value of the building as it stood before the work was begun. However, we shall later demonstrate, when considering the instructions, that the sole criterion as to the removability of the articles in suit, as far as defendant is concerned, is whether their removal will adversely affect the security in a substantial way, regardless as to the condition the building would be left in as relating to the other parts of the installation.
We have examined the cases of Dom. E. Co. v. Mazzalu (N.J.),162 A. 722, and MacLeod v. Walter J. Satterthwait, Inc. (N.J.),157 A. 670, cited by defendant. It was held in these cases that, if the removal of the articles materially injured the "institution as well as the physical property, itself, then the prior mortgagee could complain. For instance, a hotel building must be equipped with a heating plant and, even though such plant may be removed without physical injury to the building itself, the party who sold and installed the plant under an agreement with the owner that the same should remain personalty, cannot remove it over the objection of a prior mortgagee of the realty, because it would materially damage the building as a hotel institution. In the first New Jersey case last cited it was held that refrigeration plants are a necessary adjunct to an apartment, and that they cannot be removed over the objection of a prior mortgagee. Among the long list of cases first cited in this opinion, including New Jersey cases, are found many holding that an electric refrigeration plant, at least, the compressors, coils and refrigerators, can be removed, over the objection of a prior mortgagee, from apartment buildings by the vendor who retains title, and we do not understand the theory of the two New Jersey cases just cited to be recognized in this State. In the case of Wolf v. Bank, supra, refrigeration machinery was held to be removable although it was necessary to the institution *Page 841 
as a brewery. The theory of our law is based purely upon the fact that a prior mortgagee has not been injured by the removal of machinery that has been placed in the building by the mortgagor, if it can be removed without injury to the security as it existed at the time of the installation of the machinery. In other words, the damage must be to the physical structure, itself, which is the subject of the mortgage. What the rule would be in this case were the facts shown to be that the mortgagee must have taken into consideration, when it loaned the money on the building, the installation of the machinery, we need not say, for this is not the situation in this case. It appears in the two New Jersey cases cited that the apartment buildings in which the articles were installed were new buildings and it may be fairly inferred that no other equipment of the nature involved ever existed therein, while the facts in the case at bar show that another refrigeration system was in the apartment, that is, old fashioned ice boxes, before the electric refrigeration system was installed. It may have been that, in the two New Jersey cases, the loan was made upon the strength of the installation of the refrigeration systems involved. In the case at bar there was testimony, on the part of the plaintiff, that the security would be enhanced, even though the compressors, coils and refrigerators be removed, by the equipment that would be left, and we do not see how defendant can complain.
It is not our intention to decide that, even should the building be damaged by the installation of that part of the equipment that became a part of the real estate, to an extent that would more than offset its benefits, the defendant would not be entitled to complain. But it could not do so in this action, although it might have an action against both Christenson Company and the R.E. Parsons Electric Company for damaging the security for its mortgage. [19 R.C.L., pp. 323, 333, 334.]
We have examined the case of Kelvinator St. L., Inc., v. Schader, 225 Mo. App. 479, cited by the defendant, and find that that case is wholly unlike the case at bar. In that case the mortgage upon the real estate was purchased after the installation of the electric refrigeration and the purchaser had no notice, constructive or otherwise, of the agreement between the parties that the refrigerators should remain personalty. But one examining the plant, from the way in which it was installed, would reasonably conclude that the whole installation was a part of the building, not having any notice of an agreement which precluded it from becoming a part. In that case it was said, l.c. 488, that, as between the mortgagor and the original mortgagee, the mortgage having been made before the installation of the refrigeration system, the articles of the system involved were personalty on account of the contract under which they were installed providing that they should remain so. But as between the holder of the chattel mortgage and the person who purchased *Page 842 
the real estate mortgage, this would not be so, as he (or it) was an innocent third party without either actual or constructive notice of the agreement, having invested his money after the giving of the chattel mortgage upon the assumption, justified by the physical conditions, that the refrigeration plant, as a whole, was a part of the building, and having no notice or knowledge to the contrary. It was held, therefore that the compressors and refrigerators could not be removed by the chattel mortgagee, but this holding was based, solely, on the fact that the rights of an innocent purchaser of the real estate mortgage were involved.
It is contended that as the conditional sales contract was void, not having been recorded, and as the chattel mortgage was not given until after the installation was complete and not recorded until three days after its giving, which was not within a reasonable time under the facts and circumstances in this case, there was no retention of the personal character of the articles in suit, but that as soon as they were installed they became a part of the realty and, thereupon, the lien of the defendant's mortgage attached.
This suit is not based upon the conditional sales contract, but upon the chattel mortgage. The conditional sales contract was void as to creditors, whether prior or subsequent, even with notice (section 3125, R.S. 1929; Patton v. Phoenix Brick Co., supra), but not as between the parties thereto. [Vette v. Merrell Drug Co., 127 Mo. App. 229; Southwestern P.S. Co. v. Smith, supra.]
For the purposes of this suit we may assume that Christenson Company assumed and agreed to pay defendant's mortgage at the time it purchased the property and that it was a creditor of defendant. We have examined the cases cited by the defendant, including Oyler v. Renfro, 86 Mo. App. 321, and Patton v. Phoenix Brick Co., supra, and find that none of these cases, except the Patton case, which is not an authority for defendant's contention as will hereinafter be demonstrated, involve the question as to whether or not articles placed in a building remain personalty by agreement between the parties. But in each of them there was no question but that they were personal property. Of course, assuming that the articles in question were personal property, then the conditional sales contract was absolutely void as to the defendant but, as hereinafter pointed out, this does not help the defendant unless it became an intervening creditor. But what we are now attempting to determine is not based upon the assumption that the articles in question were personalty, but what we are discussing is whether they remained personalty or became a part of the realty. It has been held that whether articles of this kind become a part of the real estate is purely a matter of intention between the owner thereof and the seller and that no writing whatever is necessary to give expression to that intention. [Pile v. Holloway, 129 Mo. App. 592.] *Page 843 
As before stated, the conditional sales contract was perfectly valid as between the parties and unmistakably evinces intention on their part that the articles in suit should remain personalty. It may be that as between Christenson Company and the defendant these articles did become a part of the real property, but we are not dealing with this relationship. The rights of a third party are involved and ones which we think were fully protected by the conditional sales contract, if not by the giving of the chattel mortgage. There is no evidence or inference to be drawn from the evidence that, because the chattel mortgage was given after the property was installed and was not recorded until three days after it was given, although it well might have been recorded the same day, defendant intended to abandon its rights. The conditional sales contract reserved those rights and they remained thereafter, unless the rights of some third person intervened before the giving and recording of the chattel mortgage. The conditional sales contract preserved the rights of the seller of the articles in suit until the chattel mortgage was given and after the latter's recordation those rights were preserved to all the world. In the case of Southwestern Public Service Company v. Smith, supra, the chattel mortgage was not given until a year after the conditional sales contract was executed and that contract was never recorded, yet the court held that the rights of the seller in the compressors and refrigerators were preserved as against the claim of a prior mortgagee of the building. We are not basing this holding upon any principles that are peculiar to equitable jurisprudence. They are principles that are applicable both in courts of law and in courts of equity. While the chattel mortgage was not valid as to defendant until recorded, it was valid as between the parties from the time it was given and became binding upon defendant when recorded. [Barnard St. Bank v. Lankford, 223 Mo. App. 519, 526.] The time of recordation is material only when the rights of creditors intervene. [Singer Mfg. Co. v. Shull, 74 Mo. App. 486; Dry Goods Co. v. Brown, 73 Mo. App. 245; Williams v. Kirk,68 Mo. App. 457.] There were no intervening rights of defendant arising. Such rights as it then had arose when it became a creditor, which was before these articles were purchased and installed. As was said in Detroit Steel Co. v. Brewing Co., 233 U.S. 712, 717, 718:
"When the obvious destination of an article is to be incorporated into a structure in such a way that to remove it would destroy the other work, like bricks or beams in a building, there is still stronger ground for not giving to title an absolute right of way. But unless we give a mystic importance to bolts and screws, the mere knowledge that the chattel will be attached to the freehold is of no importance, except perhaps as against innocent purchasers for value before the sale was recorded, which the mortgagees were not."
The case of Patton v. Phoenix Brick Co., supra, relied upon by defendant *Page 844 
is, if anything, a case against it on the point now under discussion. While the court in that case stated that the conditional sales contract was void as to creditors, prior or subsequent, even with notice, it proceeds to dispose of the contention of the seller of the brick machines, title to which he reserved under an unrecorded conditional sales contract. That contention was:
"That the deed of trust to plaintiff was a charge upon real estate and the represses, though attached to and a part of the operating brick plant, remained personal property as between it and a mortgagee, whether prior or subsequent, and therefore not subject to the deed of trust."
The opinion then goes on to discuss the matter in the language we have already quoted from the opinion, recognizing that the unrecorded conditional sales contract was sufficient upon which the seller of the brick machines might make the contention that the machines remained personal property, notwithstanding the contract was not recorded, but held the rights of a subsequent mortgagee of the real estate superior to the seller of the machines because the former was an innocent third party.
Complaint is made of the giving of plaintiff's instruction No. One, which laid down but one criterion to the jury to determine whether the articles in suit remained personalty and, that was whether they "might be easily and readily removed from the building mentioned in evidence . . . without substantial injury to said building." It is contended that this instruction is erroneous because it, in effect, instructs the jury, as a matter of law, that these articles remained personalty, unless the facts submitted in the instruction were found to be true, when the question of whether they were personalty was, at least, a matter of law to be found by the jury.
It is difficult to see how there was any other issue, save the one submitted in the instruction, involved in the case, because the conditional sales contract and the chattel mortgage upon their face show what the intentions of the parties were and there is not a particle of evidence in the record to the contrary. Under the evidence of either the plaintiff or the defendant these articles, as between the owners of the real estate and the seller of the articles, were not of the character that is recognized in this State as necessarily becoming a part of the realty and, therefore, the contract between the parties governs. [Kolb v. Baking Co., 9 S.W.2d 840.] So the sole criterion as to whether or not they became a part of the realty, as to defendant, was whether their removal would materially injure the building.
However, we find that defendant is not in a position to make the contention for the reason that it joined in the error, if any, in requesting its given instruction No. 5, which is a counterpart of plaintiff's instruction No. One. [Tomlinson v. Ellison, 104 Mo. 105.] Defendant's said instruction submits whether the whole installation was *Page 845 
securely nailed, screwed or fastened to the building and tells the jury that if the removal of the articles in suit would substantially damage the building, their verdict should be for the defendant. Neither instruction submits the question as to whether the building or security would be injured by the removal of the articles in suit as it stood when they were installed.
Plaintiff's instruction is further criticised because it disregards testimony that the building was physically damaged by the R.E. Parsons Electric Company "in connection with theinstallation of the complete refrigeration system, and that this damage, at least, would remain after the removal of the compressors, coils and refrigerators, even though the removal, itself, would cause no physical damage." (Italics ours.) This theory of defendant's was attempted to be submitted in its instruction No. 11, which was refused by the court and of which refusal defendant complains. We do not agree with defendant's theory of this branch of the case. Christenson Company and the R.E. Parsons Electric Company agreed to a separation of the compressors, coils and refrigerators from the other items of the installation. They stipulated that the first should remain personalty and the latter should become a part of the real estate. It is not a question of whether the removal of the articles in suit would substantially damage the building, because there was much cutting of holes and the like in the floors, ceilings and woodwork of the building in the installation of the tubing, or because the tubing, wires and plumbing connections to the compressors remained in such a condition, which according to defendant's evidence, would be of material damage to the building if the articles in suit were removed. As before stated, such damage, if any, cannot be taken notice of in this action. The sole question to be determined is whether or not, after the removal of the articles in suit, the building would be of less value as a security for defendant's mortgage, than it would have been had they not been installed in the first place, wholly disregarding those things that were placed in the building by the R.E. Parsons Electric Company which became a part of the realty and the condition in which the building will be left, in relation to the things last mentioned, by the removal of the compressors, coils and refrigerators.
Defendant, in its brief, admits that, if Christenson Company had first placed the system, less the compressors, coils and refrigerators in the building, and in doing so materially damaged the building and, thereafter, had entered into the contract with the R.E. Parsons Electric Company to install the compressors, coils and refrigerators, that the prior installation of Christenson Company "would obviously have affected in no way the rights of the seller of the compressors, etc." But defendant makes a distinction in the supposititious facts from the facts in the case at bar because the whole installation was made by the R.E. Parsons Electric Company under one contract. We are *Page 846 
unable to discern any real distinction between the R.E. Parsons Electric Company installing the system under one contract and under separate contracts. If the R.E. Parsons Electric Company had installed the connections under one contract and it was not contemplated that it sell and install the compressors, coils and refrigerators when it did that work, then it would be fair to conclude that, under defendant's theory, it could not be charged in this suit with the damage done by that installation, even if it, thereafter, installed the compressors, coils and refrigerators under another and separate contract. As before stated, the parties separated these items in their contract into personalty and realty and they could do this as well in one contract as in a dozen, but if the installation of the connections damaged the building in any way for which defendant, as mortgagee, can complain, then defendant has its remedy by a proper proceeding. We are not now concerned with the damage done at the time of the installation of the connections, such as the tubing, wiring and pipes, but solely with whether defendant's security will be substantially and adversely affected, as of thetime of the installation, by the removal, solely, of the compressors, coils and refrigerators, having nothing of the installation in view save those three articles.
The judgment is affirmed. All concur.