**In the Matter of SCHWEN'S, INC., Bankrupt.**

**GEO. BENZ & SONS, d/b/a Oak Grove Dairy, Plaintiff,**

**v.**

**Thomas G. LOVETT, Trustee of Bankrupt Estate of Schwen's, Inc.; American Insurance Company; and James Levy, Defendants.**

**Bankruptcy No. 2–75–575(C).**

United States Bankruptcy Court,
D. Minnesota,
Second Division.

Sept. 30, 1981.

Thomas, King, Swenson, Collatz & Ryan, P.A. and Carl A. Swenson, and James J. Ryan, St. Paul, Minn., for plaintiff and claimant George Benz & Sons, d/b/a Oak Grove Dairy.

Dorsey, Windhorst, Hannaford, Whitney & Halladay and Paul J. Scheerer, Minneapolis, Minn., for defendant Thomas G. Lovett, Trustee of the Bankrupt estate of Schwen's Inc.

Robins, Zelle, Larson & Kaplan, by David F. Herr, Minneapolis, Minn., for defendant James H. Levy.

Blethen, Gage, Krause, Blethen, Corcoran, Berkland & Peterson and Stephen P. Rolfsrud, Mankato, Minn., for claimant, People's Savings & Loan Ass'n of Albert Lea.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

JOHN J. CONNELLY, Bankruptcy Judge.

The Court has before it for determination two adversary matters commenced by Geo. Benz & Sons, d/b/a Oak Grove Dairy, a scheduled secured creditor, in the above-entitled proceedings.

Benz filed an administrative claim in the original amount of $125,000.00 on September 2, 1976 for damages said to have resulted from injuries to mortgaged property securing its debt, caused by negligence of the then Receiver-Trustee, James H. Levy, in selling fixtures, permitting the building to be damaged during the removal of fixtures and personal property, failure to heat premises and failure to insure the premises while the Trustee was in possession of the realty in which Benz had an interest by reason of its mortgage. The claim was amended September 2, 1977 to assert additionally that Benz owned the fixtures and increased its damage claim to $500,000.00. James Levy, as Trustee, filed objections to the administrative claims.

Benz also filed a complaint against Thomas G. Lovett, Jr., successor Trustee of the bankruptcy estate, American Insurance Company, and James H. Levy for $500,-000.00 damages for waste to and conversion of Bankrupt's mortgaged real estate, allegedly committed by James H. Levy while he was serving as the Court-appointed Receiver-Trustee in these proceedings. The complaint was initially filed July 12, 1976 and thereafter amended, the latest amendment being the Third Amended Complaint filed September 11, 1979. Trustee Lovett filed a counterclaim against People's Savings and Loan.

The above matters having common issues of law and fact, were consolidated for trial by Order of the Court and came on before the undersigned United States Bankruptcy Judge for trial commencing on June 10, 1981.

Claimant People's Savings & Loan Association of Albert Lea (hereinafter referred to as "People's") was represented by Blethen, Gage, Krause, Blethen, Corcoran, Berkland & Peterson and Stephen P. Rolfsrud, Esq., until June 19, 1981 at which time the counterclaim against People's Savings & Loan Association of Albert Lea was dismissed upon its motion by this Court.

The Court having considered the briefs and arguments of counsel, having heard, considered, and evaluated the testimony of the witnesses at trial, and reviewed the documentary evidence received at trial, and upon all of the files, records and proceedings herein, makes the following:

## FINDINGS OF FACT

1) Schwen's Inc., in 1946 commenced the business of manufacture and sale of ice cream and ice cream related products at 222 North Main Street, Blue Earth, Minnesota.

2) On or about November 1, 1974, Maurice Schwen and Walter J. Schwen, Jr., transferred their total interest in the capital stock of the company to Patrick J. Creamer for $520.00. Creamer became the sole share holder of the company.

3) Schwen's, Inc., continued doing business in Blue Earth, Minnesota until early 1975. On April 18, 1975, Schwen's filed with this Court its Debtor's Petition for an

arrangement with its creditors under Chapter XI of the Bankruptcy Act and was retained as Debtor-in-Possession by Order of this Court.

4) The business of Schwen's was operated by the Debtor-in-Possession from April 18, 1975 until July 18, 1975.

5) The Schwen's operation had suffered large operating losses prior to the filing of Chapter XI proceedings:

| Year end 1–31–74 net operating loss | ($142,150.11) |
| Year end 1–31–75 net operating loss | ($317,707.04) |
| 2–1–75 to 4–18–75 net operating loss | ($146,814.50) |
| Retained earnings deficit as of 1–31–75 | ($406,998.04) |

(Benz Exhibit 69)

6) The total net sales for Schwen's, Inc. for fiscal year 1974 were $1,594,823.79 and for fiscal year 1975 $1,529,174.47. Mr. Robert May, President of Schwen's, Inc., testified at the first meeting of creditors that the anticipated sales for fiscal year 1976 ranged from $700,000.00 to $850,000.00.

7) On May 27, 1975, pursuant to nomination of the creditors in attendance at the first meeting of creditors on May 16, 1975, the Court appointed Levy as standby Trustee in the Schwen's bankruptcy proceedings.

8) At a July 16, 1975 meeting of creditors, the liquidation of the Debtor's business and assets was discussed and it was determined by the Court that Levy would be appointed Receiver with full powers of a Receiver for the purpose of winding up the Debtor's business and liquidating the Debtor's assets.

9) Levy was appointed Operating Receiver with full powers of a Receiver on July 18, 1975. Subsequently, on October 20, 1975 he was appointed Trustee of the Schwen's bankruptcy estate and served as Trustee until the appointment of Thomas G. Lovett as successor Trustee on August 13, 1979.

10) People's Savings & Loan Association was the owner of a real mortgage duly recorded September 12, 1966, covering the Schwen's, Inc., real property located in Far-ibault County, Minnesota, more fully described in Benz Exhibit 1. The mortgage included "... all rights, privileges, easements and appurtenances thereunto attached" including "... all heating, air conditioning, lighting, and water supply apparatus, storm windows and doors, window screens, screen doors, window shades, awnings, locks, fences, trees, shrubs and all other fixtures and improvement." In addition, the said mortgage provided that the mortgagor would keep the property in good repair, fully protected from the elements, commit no waste thereon, and not remove or permit removal of any buildings, or fixtures of any kind, from the premises. This mortgage constituted a first lien upon the real estate described in the mortgage.

11) The original principal amount of the People's mortgage was $65,000.00; a supplemental agreement added $20,000.00. The unpaid principal indebtedness on the People's mortgage at the time Schwen's filed its petition for a Chapter XI proceeding was $17,615.05. Schwen's was in default under People's mortgage when it filed Chapter XI proceedings. Mortgage foreclosure proceedings had been commenced by People's on February 19, 1975.

12) Benz was the owner of a real estate mortgage on Schwen's real property recorded June 25, 1974, in the original amount of $50,000.00 covering the real estate more fully described in the mortgage deed (Benz Exhibit 2) "... together with the hereditaments and appurtenances thereunto belonging to the mortgagor..." Benz's mortgage constitutes a first lien upon a portion of the Schwen's premises but by and large, the Benz mortgage constituted a second lien to the lien of the mortgage of People's on the Bankrupt's real estate.

13) The mortgage from Schwen's to Benz secured a note given by Schwen's for a past due account. Schwen's did not receive any money as a result of the mortgage transaction with Benz. At the time Schwen's filed its petition under Chapter XI of the Bankruptcy Act, there remained an outstanding principal indebtedness of $40,000.00. Schwen's was in default on its mortgage to

Benz commencing with the payments due in September of 1974 and continuing through April of 1975. Benz had commenced an action in the State District Court to foreclose on Schwen's mortgage prior to the time Schwen's filed its petition for a Chapter XI proceedings under the Bankruptcy Act.

14) A Sheriff's Mortgage Foreclosure Sale according to Minnesota law was conducted by permission of the Bankruptcy Court, pursuant to People's mortgage foreclosure proceedings, on September 30, 1975 and People's was the highest bidder at said sale in the amount of $20,692.47. Said mortgage provided for a one-year redemption period from date of sale.

15) A Sheriff's Mortgage Foreclosure Sale according to Minnesota law was conducted by permission of the Bankruptcy Court, pursuant to the Benz mortgage foreclosure proceedings, and Benz was the highest bidder at said sale in the amount of $46,737.20. On October 9, 1975, the Sheriff's report of sale stated that he had sold the property described in the judgment and decree to Benz for $46,737.20. On October 9, 1975, an Order confirming said sale was entered by the District Court of Faribault County, Minnesota. Said mortgage contained a six-month redemption period from the date of sale.

16) James Levy, the Court-appointed Receiver-Trustee in these proceedings, had been served with notice of both Sheriff's Mortgage Foreclosure Sales.

17) Levy, as successor in interest to Schwen's, did not redeem from either mortgage. However, Benz redeemed from the People's mortgage sale on October 1, 1976, by the payment of $33,972.17 to People's and received a duly executed certificate of redemption which was duly filed. By reason of said redemption, Benz was and is the owner in fee of the premises involved herein from October 1, 1976 and with all rights of People's as mortgagee from the date of filing of its mortgage.

18) The Schwen's, Inc., bankruptcy Chapter XI Statement of Affairs and Schedules of Property and Creditors were filed, as required by the Bankruptcy Act, with this Court on April 30, 1975.

19) The Schwen's real estate, which was the security for the People's and Benz mortgages, was listed on the Statement of Affairs and Schedules of Property of Schwen's, Inc., filed with the Court by the Bankrupt on April 30, 1975 in Schedule B–1 as real property having a market value of $260,000.00.

20) The property claimed by Benz to be "fixtures" and subject to its real estate mortgage constitutes the operating, processing and manufacturing equipment of the Bankrupt and is listed as personal property under Schedule B–2(k) in the schedules filed with the Bankruptcy Court with Bankrupt's estimated market values of $90,000.00 and estimate salvage value of $40,510.00. (Benz Exhibits 5 and 28)

21) Benz claims as fixtures items number 2 through number 85 in Benz Exhibit 28 at a value of $102,000.00.

22) At all times pertinent hereto, Benz was represented by attorney Carl A. Swenson and his law firm in the filing of the administrative claims against this bankruptcy estate and in the action against Trustees Lovett and Levy.

23) On May 1, 1975 Attorney Swenson reviewed the file in the Schwen's matter at the Bankruptcy Court office, including the Petition, Schedules of Property, and Statement of Affairs, and attended the first meeting of creditors as scheduled by the Court on May 16, 1975 at Mankato, Minnesota, and an adjourned first meeting of creditors on July 16, 1975.

24) At the adjourned first meeting of creditors on July 16, 1975 the Court, after hearing all interested parties, determined it highly unlikely that Schwen's could operate as a going concern, that it could not, as a Debtor-in-Possession, pay its Debtor-in-Possession obligations as they became due and that it would be unable to propose a plan to deal with its unsecured creditors. The Court also determined that it was in the best interest of the creditors that the proceedings not be dismissed. The Court de-

termined that it was in the best interest of the creditors that inventory on hand should be processed into product to be sold to recover the optimum return for the creditors out of inventory, and to liquidate all assets of the Debtor as promptly as possible. In open court, the first meeting of creditors was further adjourned to August 14, 1975.

25) Pursuant to the Court proceedings and creditors meeting of July 16, 1975, the Court on July 18, 1975 removed the Debtor-in-Possession from possession, control and operation of the Schwen's business and appointed Levy Operating Receiver with full powers of Receiver.

26) On August 14, 1975 a further meeting of creditors was held at Mankato, Minnesota at which time liquidation of the personal property of Debtor was discussed. Mr. Levy made a report to the Court at the time of his activities as Receiver and recommended to the Court that the personal property of the Debtor be disposed of by sale. The Court directed the Receiver to prepare a petition for sale together with a proposed order.

27) On August 18, 1975 Levy filed a petition together with a proposed order authorizing the sale and liquidation of all the tangible personal property of Schwen's, Inc. The Court signed and entered the Order authorizing and directing the sale of the tangible personal property of Schwen's on August 19, 1975.

28) The Clerk's office of the United States Bankruptcy Court at St. Paul, Minnesota gave notice of the pending sale of tangible personal property to all creditors of Schwen's, including Benz and People's, by serving a copy of the Order authorizing the sale of all the tangible personal property of Schwen's by United States mail upon all the scheduled creditors of Schwen's, Inc.

29) Neither Benz, nor People's (other than Benz's claim that the items in Benz Exhibit 28 are part of the realty covered by both real estate mortgages), have by any means asserted a security interest in any of the property listed in Bankrupt's Schedules B-2 as personal property. No other creditors have claimed a security interest in the personal property listed in Debtor's Schedule B-2(k).

30) The Court's Order of August 19, 1975 did not authorize, direct, or order the Receiver to sell the Debtor Schwen's real property; the Order did not authorize, direct, or order the sale of the intangible personal property of the Debtor; the Order did authorize and direct the Receiver to sell only the tangible personal property of the Debtor Schwen's, Inc.

31) The unofficial appraisal referred to in the Receiver's petition for sale of Debtor's tangible personal property was not made a part of the records of this bankruptcy case until the time of the trial of these matters when it was produced by Benz and received into evidence as Benz Exhibit 29.

32) The items listed in Exhibit 29 constitutes property which came into the hands of the Receiver on July 18, 1975 from the Debtor-in-Possession when he qualified as Receiver, for which he is accountable to the Trustee and creditors of the bankruptcy estate.

33) Benz Exhibit 28 is an extract of Exhibit 29 and is a list of all the items of property claimed by Benz to be part of the Schwen's realty and subject to the lien of both the People's mortgage and Benz mortgage and not personal property.

34) The Receiver, Levy, prepared a sales brochure from Exhibit 29, the informal "Schlueter Appraisal" referred to in the Receiver's petition for authority to sell all the tangible personal property of the Debtor and circulated it to people in the dairy and ice cream industries.

35) Benz received a copy of the sales brochure which was mailed to it on August 26, 1975 and had actual notice prior to sale that the Receiver in Schwen's bankruptcy estate was selling at private sale the property of Schwen's Inc., as listed in the sales brochure.

36) Benz at no time prior to or during the pendency of the Receiver's sale of property pursuant to this Court's Order of August 19, 1975, notified the Receiver Levy that it claimed any of the property listed in the

Debtor's Schedule B–2, or in the sales brochure as circulated by the Receiver as real or personal property subject to its mortgage.

37) Robert W. May, former President and Manager of Schwen's, Inc., was employed by the Receiver Levy to supervise and conduct the sale of the property advertised in the sale brochure. Mr. May died in the summer of 1977.

38) A sale of the equipment listed in the sales brochure was held September 2, 1975 through September 15, 1975 and thereafter.

39) Upon consent signed by Patrick J. Creamer, President of Schwen's, the Court entered its Order of October 9, 1975 adjudicating Schwen's to be bankrupt.

40) There are 83 pieces of equipment (excluding the Bally freezer and boiler) claimed by Benz in Exhibit 28 to be fixtures and part of the real estate and subject to the lien of the People's and Benz mortgages.

41) The following items claimed by Benz in Benz Exhibit 28 to be part of the Schwen's property real estate and subject to the lien of the People's and Benz real estate mortgage lien are in fact part of the real estate by reason of purpose of use, manner of attachment, and intent of mortgagor.

| ITEM | REMOVED BEFORE OR AFTER FORECLOSURE SALE | AMOUNT REAL ESTATE DIMINISHED IN VALUE BY REMOVAL |
| --- | --- | --- |
| Bally Freezer | After | $26,515.00 |
| Pressurized Steel Water Tank | * | 750.00 |
| King Sharpe Freezer | * | 700.00 |
| " " " | * | 700.00 |
| " " " | * | 700.00 |
| Chain Hoist | After | 180.00 |
| Vent Fan | Before 9/16/75 | 30.00 |
| Emergency Lighting | Before 9/11/75 | 200.00 |
| Two Sinks | * | 190.00 |
| Water Heater | * | 10.00 |
| Freezer-walk through-pass through doors | * | 500.00 |
| Blower/Evap. units in the Hi-Temp Cooler | * At $250.00 each | 500.00 |

There is no evidence before this Court indicating that the asterisk items were removed from the premises. Because unsecured creditors financial interests are involved, counsel for Claimant by affidavit filed within five (5) days from date of entry of this Order shall inform this Court whether or not these items are still on the premises.

42) The Bally freezer complete with refrigeration equipment was sold by the Trustee on October 24, 1975; it was part of the real property of the Bankrupt Schwen's, Inc., and was security for the mortgage of People's and Benz mortgages and subject to the lien of said mortgages.

43) The Look-out 80 horsepower gas and oil boiler, controls, and water feed equipment claimed by Benz to be part of the realty is part of the real estate subject to the lien of People's and Benz mortgages. These items were not sold and remain on the premises in Blue Earth, Minnesota.

44) The steel pressure water tank apart from its size and any evidence other than its attachment by piping to the general system of the building, is a unit that could serve a general purpose of any building having a water sprinkler system as present in the Schwen's building and is part of the realty.

45) The three King Sharpe freezers and two evaporator units in cooler A have been on the Schwen premises at least since 1966.

In the detailed Patchin Appraisal done at the then owner-operator's request in 1966, the three King Sharpe freezers and two evaporator units were distinguished from the rest of the equipment and machinery as being part of the building construction. All other refrigeration items in the appraisal were categorized as "Plant Equipment." The same categorization of these three freezers and evaporator units was similarly repeated in the 1974 Patchin Appraisal made at the same owner's request. The categorization was acceptable to the Schwen's owners as evidenced by the books and financial records of the company adopting the land, building, and equipment valuation assigned to those groups of assets by the appraiser.

46) The main Schwen "processing" building contained 20,138 square feet including basement. The main structure included two freezer rooms and a cooler room on the first floor which were part of the building construction. The freezer-walk through-pass through doors included in Benz Exhibit 28 are part of this freezer space and, consequently, a part of the real estate subject to the lien of People's and Benz mortgages. The total square footage for all eight buildings combined is 29,471 square feet.

47) The remaining items in Benz Exhibit 28 claimed to be part of the realty are classified into the following categories for ease of reference:

1. Tanks and vats—for processing, pasteurizing, storage and holding materials (21)
2. Pumps (9)
3. Meters (2)
4. Material handling conveyors—200 feet plus 90° turnpiece
5. Homogenizers (2)
6. Product cooler (1)
7. Ice Cream Container Filler Machines (4)
8. Package Wrapper
9. Processing Equipment Parts Washer (1)
10. Ice Cream Freezers (4)
11. Walk-in Freezer (1)
12. Evaporator-condenser (3)
13. Storage Racks (40)
14. Air Compressor (2)
15. Compressors and ammonia booster system (8)
16. Refrigerator Milk Cabinets (2) (One 60 inches wide × 66 inches high and the other 45 inches wide × 40 inches high.)
17. Miscellaneous—syrup warmer, butter fat tester, metal band tape dispenser.

Many of the above items are inter-connected either by stainless steel piping for moving and packaging product, or ammonia freezer piping for cooling purposes; many items also have electrical connections. Items No. 4, 8, 11, 13, 14, 16 and 17 are not inter-connected and are portable and readily moveable.

48) With the exception of the two air compressors and the refrigerated milk cabinets, all the claimed pieces of equipment in Finding No. 47 constitute an ice cream manufacturing process in the Schwen's plant and at all times material herein when they were inter-connected were capable of producing ice cream. Each of the above items is adaptable to use in an ice cream making process. None of the above items have been constructurally or actually attached to the realty in a manner so as to make them a part of the realty.

49) Although each item in Finding No. 47 is a component of an ice cream making process, each item is personal property and not part of the realty.

50) The type of equipment, the size, the weight, the interchangeability of the items with other items, manifest an intent taken with other evidence in the record to show that neither of the owner-mortgagors of these items ever intended them to be a permanent part of the real estate or to be an integral part of the building. Without exception, all articles, including and in particular the evaporator-condenser on the roof, while of large dimensions are not of unusual weight and are easily removeable from the Schwen's premises without doing damage either to the item itself or to the building structure.

51) The compressor and ammonia systems were necessary component parts of the ice cream making process, adaptable to the purpose for which they were being used, but not attached to the building in any manner to indicate intention to make them permanent additions to the building: In particular, reference is made to the evaporator-condenser which had been located on the roof of the building which was attached to an iron frame which in turn sat on the roof surface. This unit was connected to the operating equipment by pipes and tubes which did not enter the roof of the building, but rather were extended openly across the roof and down the outer wall and through a lower level window for connection to the production process. The unit was placed in an outside location for ease of installation and removal purposes and was not attached permanently to the building. It was attached by pipes in that unusual way to avoid connecting pipes interiorly to avoid alteration of inside building construction. At the sale it was lifted off the roof by a crane.

52) Item No. 56 of Benz Exhibit 28 is described as a "Portable Master Built Walk In Cooler complete with compressor, 9 feet wide by 20 feet long, by 7 feet high." This walk-in cooler was situated outside the ice cream production area in the truck docking area. It was a self-contained unit. The cooler was readily moveable. It was not attached to the building structure but was a free-standing unit and moveable without doing damage to the building or to the cooler itself. It was adaptable for use in conjunction with the operation of an ice cream manufacturing plant, as well as many other uses; particularly in food handling businesses.

53) Schwen's prior to these bankruptcy proceedings had exchanged pieces of plant equipment with Green Giant Corporation and had sold, removed, and added pieces of equipment during the time periods People's and Benz mortgages were in effect. Some production pieces had been removed from the production line process and were not in use but stored on the premises.

54) The conveyors and conveyor belts sections were in some instances attached to the floor or walls of the freezers. The attachments were minimal and for purposes of giving stability during use. These conveyor sections would serve no general building purpose, are readily moveable, and the detachment of the holding bolts would not damage the building in any respect when removed. No presumption can be indulged upon the record before this Court that the conveyor lines were intended by the owner-mortgagor to be part of the realty. Some equipment used in the ice cream making process were leased articles.

55) The tanks and vats used in the ice cream making process varied in capacity and bulk but from the 20-gallon to the 3600-gallon tanks, none of them lost their identity as personal property when placed in the building for purposes of becoming a component of the total ice cream making process. The tanks and vats were free-standing units connected with stainless steel piping attached for moving product from the reception area through the mixing, freezing and packaging steps of the process. The pumps were a necessary part of the component system for transporting the raw material ingredients through the system. All of the pieces of equipment, including those with electrical connections, were free-standing items in an open space area held in place by their own weight; all were adaptable for the purpose of making ice cream in a total integrated system, each capable of being removed from the producing line and building without damage either to the equipment or the building.

56) The Schwen's configuration of eight buildings does not constitute a "single purpose building," nor do any of the eight buildings standing apart, or separately, constitute a single purpose building. The main building was not built specifically for manufacturing ice cream, nor was it structurally altered to accommodate the equipment placed in it to manufacture ice cream.

57) The Schwen's configuration of eight buildings is suitable for uses other than a dairy or ice cream making plant. By reason

of the built-in cooler room and freezer rooms, the Schwen's buildings are especially orientated for use as food processing operations, including ice cream manufacture, or dairy plant, as well as other businesses having need of refrigerated space.

58) The owner, mortgagor, and plant operator of the Schwen's, Inc., plant consistently since 1966 have manifested their intent that the plant equipment was not part of the real estate by having experts appraise the company property and by directing the appraisers to evaluate the land, building, and plant equipment separately. In 1974, the appraisers were specifically instructed to not take into account spare parts, machinery and equipment (Levy Exhibit 2) in determining the market value of the real estate.

59) The owner, mortgagor, and plant operator-manager prior to the sale to Creamer, made a distinction on the books and financial records of the company between land, buildings, and plant equipment. Separate values were assigned on the balance sheet of the company for land—buildings—machinery—equipment.

60) Creamer, the new owner of Schwen, Inc., in November of 1974, was not a party to either mortgage and the only evidence of his intent with respect to the plant equipment and machinery is the identification of the same as personal property in the Schedules he caused to be filed in these bankruptcy proceedings.

61) Shortly before its bankruptcy proceeding, Schwen's had considered a substantial capital investment in replacement and additional production equipment to upgrade, modernize, and increase the efficiency of its operation. Such new equipment would permit, among other things, the cleaning and sanitizing of its production equipment without the need to disconnect and disassemble the equipment on a daily routine basis.

62) Equipment of the type claimed by Benz to constitute "fixtures" is commonly considered in the dairy industry to constitute personal property, is commonly removed, resold, upgraded, traded, modified, sold, bought, leased, and otherwise treated as severable from, and not a part of, real estate.

63) Mortgagees do not commonly consider or intend production equipment used in manufacturing processes to be affixed to, or a part of, the real estate covered by their mortgage.

64) The items of property in Finding No. 47 which were sold by the Court and which comprised various items of production and related equipment utilized in the manufacture of ice cream by Schwen's were personal property, not "fixtures", and were not encumbered by the lien of the Benz mortgage or the People's mortgage.

65) Levy, as Receiver-Trustee, had exclusive possession of the Schwen's, Inc., land and buildings from July 18, 1975, when he was appointed Receiver, until March 15, 1976 when he surrendered the premises to People's, the first mortgagee of the premises.

66) The Schwen's plant at the time of the Chapter XI proceedings were commenced was run down and delapidated, was in need of substantial capital improvement and was outmoded and inefficient.

67) The only boiler in the Schwen's building used for heating the premises was inoperative at the time Levy was appointed Receiver. People's and Benz were aware of the inoperative condition of the boiler no later than early December 1975. (Benz Exhibit 68. May Deposition—33, 36, 37.) No damage from freezing had occurred to the building before this time.

68) During the redemption period from the Benz and People's foreclosure sales, representatives of Benz and People's had entry access to the Schwen's plant and did enter the building periodically and in particular before Christmas 1975.

69) Benz claimed a loss on the Schwen's mortgage of $15,972.00 for the year 1976 in its tax return filed with the United States Internal Revenue Service. This loss was calculated by subtracting the total Benz investment of $40,000.00 issued to Schwen's

and $33,972.00 paid to People's to redeem the first mortgage, less the fair market value of the land pursuant to appraisal of $58,000.00.

70) People's has disavowed all claims made in its name or on its behalf by Swenson, including the Amended Administrative Claim.

71) During the removal of personal property, a portion of a false wall was removed by the Receiver to facilitate the removal of two storage tanks from the processing area—the wall was not replaced. The partial removal of the wall occurred in early September, 1975, before the first mortgage foreclosure sale took place. Other partition walls were damaged subsequent to the time Levy was appointed Receiver. There is no testimony or evidence in the record to indicate that such other damage was caused by the Receiver-Trustee.

72) Benz knew of this condition of the wall and general interior condition of the Schwen building on October 9, 1975 when it purchased the land and building from the Sheriff at the Sheriff's Foreclosure Sale.

73) During the period 1955 to 1972 the number of operating ice cream plants manufacturing ice cream for the wholesale trade in Minnesota was reduced from 583 to 30. From 1972 to 1981, the number of operating ice cream plants was further reduced to just 11, three of which make retail sales only and one of which sells only ice cream mix.

74) The Schwen's plant was an outdated plant which could not produce ice cream at a cost competitive with the cost of production incurred by major, modern ice cream producing facilities in its marketing area.

75) Schwen's, Inc., had experienced numerous problems with health authorities, had been cited for repeated health violations, and at the time of the appointment of the Trustee the health authorities had condemned the ice cream in process in the plant as unfit for human consumption. As early as January 1975, the plant had been "declared as marginal" for food processing uses and would require expenditures of ap-

proximately $70,000.00 to bring it up to health standards. (Levy Exhibit 11)

76) Benz does not claim any interest in personal property in this action. Neither Benz nor People's at any time perfected a security interest in any personal property in the Schwen's plant.

77) At all times material hereto, the interests of Benz have been adverse to the interests of Levy and of the general creditors of Schwen's.

78) James H. Levy acted reasonably in relying on Milton Rosenberg's opinion that the indebtedness on the Schwen's property exceeded its fair market value in October 1975 in determining not to redeem the property from the Sheriff's Foreclosure Sale.

79) The value of the Schwen's land and building on September 30, 1975 was $67,429.00; the total amount paid at the Sheriff's Sale as of October 9, 1975.

80) The value of the Schwen's land and buildings in March 1976 when Levy surrendered the premises to People's was $67,429.00 less the diminution in value resulting from the removal of the Bally freezer section which diminution the Court finds to be $26,515.00. The diminution would be greater by the amounts of value indicated for the items to be part of the realty in Findings of Fact No. 41 of these Findings, if in fact said items have been removed from the premises.

81) Levy acted in a reasonable, prudent manner in exercising his fiduciary duties as Receiver-Trustee in these proceedings and was not negligent in disposing of the Trustee interest in the personal property of the Schwen's estate.

82) Plaintiff has received a bona fide offer to purchase Schwen's land and buildings for $50,000.00 but has not accepted the offer.

83) Benz chose not to introduce any evidence of the cost to repair any damage done to the building caused by removal of equipment, machinery, or other items.

84) Patchin's updated appraisal as of September 30, 1975 makes two basic assumptions in error in arriving at its Sep-

tember 30, 1975 current market valuation. The appraisal is in error in assuming the highest and best use of the Schwen building was that of an "ice cream manufacturing plant". The second error was assuming the land and building was "in continued use" at the time the appraisal was made as a "going concern" when in fact operations and production had ceased permanently approximately two months earlier.

85) Plaintiff-Claimant has failed to establish that damage, if any, due to frozen pipes or water equipment, was caused by any negligent act of the Trustee Levy.

## CONCLUSIONS OF LAW

1) Claimant George Benz & Sons, Inc. is entitled to the diminution of the value of the premises upon which it had a real estate mortgage between the dates of the foreclosure sales and March 16, 1976 when possession of the premises was turned over to People's Savings & Loan Association. The amount recoverable is the difference in value of the real estate immediately before the foreclosure sale and March 16, 1976,

2) The Claimant is not entitled to any diminution of the value of the land or buildings (or any assets connected therewith whether "fixture" or otherwise) either before the foreclosure sales or after possession was given to People's Savings & Loan.

3) None of the equipment claimed by Plaintiff as fixtures, except as hereinbefore expressly found to the contrary, were fixtures under Minnesota law.

4) The Benz foreclosure of its real estate mortgage did not convey title in respect to any properties listed in Schedule B–2 of the Debtor's schedules filed in its Chapter XI proceedings.

5) The Claimant George Benz & Sons, Inc., is entitled to recover from the Trustee Thomas G. Lovett, to be paid out of the assets of this estate, the sum of $31,445.00. This amount will be lessened to the extent of the value of items listed in Findings of Fact No. 41 above still remaining on the premises.

6) To the extent James Levy caused any damages to the Schwen's property in the removal of, or as custodian of, the property, the same were caused by him acting in his official capacity as Court-appointed Receiver or Trustee and not as an individual.

7) The Plaintiff's complaint against James Levy for negligence in the performance of his duties as Trustee and Receiver has not been sustained by the testimony and evidence received in these proceedings, and Plaintiff is not entitled to recovery from James Levy in his individual capacity.

8) The Plaintiff chose not to present evidence to this Court respecting the individual cited items of damage to the building, the partial removal of a false wall, removal of office partitions, or frozen pipe lines, and the Court may not speculate as to the amount of those damages necessary to compensate for those repairs.

9) To the extent that damages to the building did occur during the time the building was in the possession and control of Levy, the Court assumes that Benz took them into account in making its bid for the property on October 7, 1975. The Court's valuation of damages based on the theory of damages adopted and employed by the Claimant-Plaintiff in these actions is a maximum of $31,445.00. To arrive at any other result the Court would have to speculate as to claimed injuries for which no proof has been offered as to damages sustained. This would be true even if the injury to the property occurred after the Sheriff's Foreclosure Sale of September 30, 1975.

10) To the extent the premises were damaged by failure to heat the premises, the responsibilities were those of Benz having been put on notice of Trustee's intent not to heat. Benz had a duty to protect its substantial interest in the building and had adequate remedies at law to prevent the foreseeable damages of which it had sufficient warning.

11) There is no justification or authority for allowance of attorneys fees, costs, and expenses to be paid out of the assets of this estate to the attorneys for Claimant or Defendant Levy.

## ORDER

The Claimant's Administrative Proof of Claim is allowed in the sum of $31,445.00 as conditioned in the foregoing Findings of Fact No. 80.

The Plaintiff's action against Thomas G. Lovett and James H. Levy individually are dismissed with prejudice.

The Court retains jurisdiction over James H. Levy in his representative capacity as Receiver-Trustee and American Insurance Company pending the final and complete administration of the Schwen's, Inc., bankruptcy estate.

IT IS FURTHER ORDERED that Plaintiff-Claimant, George Benz & Sons, and Defendant James Levy pay their own individual attorneys fees, costs and expenses.

## DISCUSSION

Claimant suggested at trial that Levy as Court appointed Receiver made the decision to close down and liquidate Schwen's. The Court rather than Levy made that decision. The unsecured creditors wanted the Court to adjudicate the company bankrupt in June 1975. The Court instead decided to appoint a receiver so inventory could be turned into accounts receivable to realize more money for the estate. Claimant critizes Levy for moving too quickly in selling the personal property because there was no emergency. Again, it was not Levy's decision to conduct an early sale, but the Court's. A receiver appointed in bankruptcy is generally a mere custodian, but a receiver appointed by the Court with enlarged powers has authority greatly in excess of custodial powers—he has the power to sell assets if directed by the Court to do so. It is the exception rather than the rule that a receiver appointed by the Court would sell assets. The Court appointed Levy Receiver "with full powers". Levy with twenty-five years experience knew the import of being granted all the powers a receiver could possess. The Court anticipated prompt action to liquidate the assets. It was the Court's decision that immediate steps be taken to promptly liquidate not only saleable merchandise but all the assets of the Debtor.

The Plaintiff's claim stems from its status as a secured creditor in the Schwen's bankruptcy case. It is not the claim that a secured creditor would ordinarily make. Generally a secured creditor seeks to recover its security and the law is clear that secured creditors are not affected by bankruptcy proceedings and are entitled to their security free of the claims of the unsecured creditors of the bankruptcy estate. Here, however, Plaintiffs allege that they have been deprived of part of the security which they had recovered from the estate by the wrongful acts of the Receiver-Trustee.

The Claimant asserts Levy sold "fixtures" out of the Schwen's plant. Levy was acting pursuant to a Court order authorizing him to sell *only* personal property. He was required to make a judgment as to what he could sell. Within the direction of the Court order allowing sale, he had to exercise discretion—he could not properly exceed the authority granted in the order. Being an experienced Bankruptcy Trustee and bankruptcy practitioner of some twenty-five years, he exercised judgment in the light of those years of experience and his accumulated knowledge in dealing with all kinds of personal property in bankruptcy estates. His judgment was not recklessly or carelessly exercised. He had discussions with Mr. May, his agent in charge of the sale, about what items in the plant could be sold. Levy had inspected the equipment in the plant. He had conducted other liquidation sales in other cases, had made determination of what or what was not fixtures. His previous decisions had never been questioned. Levy had made a U.C.C. search and found no filing respecting personal property of Schwen's so he correctly assumed no security interest existed in it and he was free to sell it for the estate. As Receiver he had to make the decision as to what he could sell—he made that decision and proceeded accordingly. Differences of opinion are bound to exist respecting certain articles. Mr. Heller, an extremely knowledgeable person in dairy and ice cream plant operations and a persuasive witness, was

unequivocal in expressing his opinion that the Bally freezer was personal property, yet the Court does not agree with him in this instance.

Judicial attempts to delimit "fixtures" have given rise to one of the most confusing areas of jurisprudence. Cases can be found to support any position that the facts of a particular case may suggest. Thus, where in this case Levy is accused of negligence for selling a "walk-in cooler" as an item of personal property, another trustee was found to have *erred* in claiming a walk-in freezer to be a "fixture" subject to the lien of a real estate mortgage. *In Re: Kann, 6 U.C.C. Reporting Service 622. In Re: Kann* is a Pennsylvania case and the Court said the Pennsylvania "Industrial Use Doctrine" did not apply because the building involved was not a "plant" within the intendment of that doctrine and, accordingly, applied criteria to determine the issue not unlike those applied in Minnesota.

Benz alleges gross negligence on the part of Levy as operating Receiver and Trustee on the theory that he wrongfully sold fixtures within the mortgages of People's and Benz and that he permitted waste upon the real estate during the mortgage period of redemption. It is agreed by Trustee Lovett's counsel that if the Receiver-Trustee did sell "fixtures" the same were not assets of the estate and the Claimant should be reimbursed for them out of the assets of the estate. The parties are in irreconcilable conflict as to the other allegations contained in the claim and complaint.

People's and Benz held individual real estate mortgages on the property of Schwen's, Inc. The mortgages contained standard covenants against waste and, in People's, removal of fixtures. Removal of fixtures is a form of waste giving rise to liability. Benz claims in these proceedings that it derives its rights either through the Benz mortgage or the People's mortgage. Benz has standing under either mortgage to pursue the claims before the Court. The approximately $90,000.00 in the estate is insufficient to respond to the claimed damages and the Court recognizes that the Benz complaint is for the further purpose of holding Levy individually responsible for the damages.

Benz had notice of the Court's intention to sell the tangible personal property of the Debtor. While the notice of the Order of Sale did not list items to be sold, Benz's attorney had reviewed the Schedule of Assets filed by the Debtor and they contained three pages listing plant equipment and related articles, similar to those in Benz Exhibit 28. Benz prior to the actual sale also received a copy of the sale brochure which listed and described the items which Levy proposed to offer for sale.

Secured creditors have a duty and responsibility to monitor the bankruptcy proceedings and to keep informed of the action taken with respect to property in which they claim an interest. In the absence of information that someone was disputing the Receiver's decision to sell certain property, he had no duty to seek any more Court approval than he already had. A secured creditor with knowledge of a Receiver's intent to sell specifically identified property cannot remain silent with that knowledge and not act upon it and then be heard to complain that the Receiver made the wrong decision. The secured creditor is entitled to prove the Receiver was wrong in selling certain property and recover damage for those items, but it avails the creditor nothing in these circumstances to contend the Receiver was grossly negligent for making that decision when the creditor had the opportunity and the right upon application to the Court to be heard and to restrain the Receiver if he was acting improperly.

Mr. Swenson knew that Levy was selling the personal property of the estate and he is charged with knowledge of the specific items to be sold because they were largely listed in bankrupt's property schedules on file with the Court, schedules Mr. Swenson acknowledges he reviewed.

The mortgages purported to cover certain premises and "all appurtences and hereditaments" and fixtures. Neither mortgage makes specific reference to the "machinery or equipment" which are the subject of this dispute.

Both People's and Benz had commenced mortgage foreclosure proceedings prior to the time Schwen's filed its Petition under Chapter XI of the Bankruptcy Act. The filing of the Chapter XI Petition effectively stayed the mortgagees from proceeding with their foreclosure proceedings without permission of the Bankruptcy Court. Early in the bankruptcy proceedings, both People's and Benz appeared before the Bankruptcy Court seeking relief from the stay. After several court appearances and upon formal application, permission was granted for the mortgage foreclosure proceedings to proceed. Eventually, sheriff's sales were conducted according to law and Benz, having redeemed People's first mortgage, holds the fee title to the premises. The statutory right of redemption from the sheriff's sale passed to Levy as property of the bankruptcy estate; he determined that it was not in the best interest of the creditors of the estate to redeem and did not exercise the right.

Schwen's, Inc., operated an ice cream manufacturing business in a building which it owned in Blue Earth, Minnesota, a community of about 4,000 people. The business had been in operation at least since 1946 at the same location. The Schwen's plant was a complex of eight buildings built at various times. The main building is a substantial brick building with basement. The first floor contains 11,214 square feet of which 3,226 square feet is built-in cooler and freezer space with freezer units. The original use intended for the building is not known.

In the bankruptcy proceedings, the question arose as to whether certain machines and articles of equipment were fixtures constituting a part of the real estate, or personal property.

There are two basic issues to be decided by the Court in this case:

1. Did the Receiver-Trustee sell as personal property of this estate articles which in fact were fixtures subject to the mortgage lien for which the estate should compensate the Claimant.

2. Did the Receiver-Trustee by negligent act or omission cause injury to property owned by Claimant for which the estate and Levy as an individual should compensate the Plaintiff.

## FIXTURES

The specific items claimed by Claimant are listed in Benz Exhibit 28. They are items of production equipment and which in origin were personal property. They may be categorized as ice cream freezers, pasteurizers, evaporation and condensing units, mixers, packaging machines, pumps, container fillers, conveyor rollers and belts, tanks, vats and the piping necessary for inter-connection of the individual pieces to provide a continuous-flow system for moving raw materials through various stages to finished product. The Court has concluded that some of the articles that the Receiver did advertise for sale, and later sold, were in fact fixtures and the estate must respond in damages for those items.

The Claimant has alleged wrongful taking and sale and has the burden of proving the items which were removed from the premises were in fact a part of the realty. The report of sale filed by the Trustee with the Court does not fully satisfy the Court as to the actual disposition of the personal property that came into his possession. The property he advertised for sale and property listed in the Bankrupt's Schedules are the items the Trustees of the estate must account for before the Court can conclude the bankruptcy case.

The Claimant's interest is adverse to the unsecured creditors of the estate as well as to Levy. Claimant is not relieved of the burden of proof because the Receiver-Trustee has filed an incomplete report of sale. The fact that Claimant demanded prior to trial that such a report be filed and the Court did not order the same has no bearing on placement of the burden of proof in the present litigation.

Because the Court has found some of the items in Benz Exhibit 28 are fixtures and since the general funds of the estate must

be used to respond in damages for such sales at the expense of the unsecured creditors, the Court requires that Claimant inform the Court whether or not those items (found to be fixtures herein) still remain on the premises. The Court's concern is that the testimony as to each individual item was scant. Testimony of Claimant's witnesses indicate that some items were on the premises after Levy had surrendered the property. Mr. Pingrey, for example, testified in his appraisal report that as late as 1981 a large sugar tank was still in place.

The Claimant has failed to sustain its burden of proof that the items listed in Benz Exhibit 28 automatically lost their character as personal property by being installed in the Schwen's building for the purpose of making ice cream. The only evidence presented by the Claimant in support of its position was the testimony of Mr. Ray Gerner an employee of the Schleuter Company. Mr. Gerner has had a life-long association with food processing equipment particularly in the dairy industry. Mr. Gerner was a competent witness. He testified that the system had to be dismantled daily to be cleaned for health reasons. He offered no testimony that any of the items were of unusual weight or of any unusual affixation to the building. With the exception of the few bolted items, his testimony was to the effect that the items were held in place by their own weight and connecting pipe fittings. Mr. Ryan examined Mr. Gerner item by item listed in Benz Exhibit 28 and Gerner responded as to how each item was connected to the "process-flow system"—some items required steam, some electrical, some ammonia, some a water hook up. His testimony was notable from the standpoint that he indicated throughout his examination that he was talking in terms of the "flow-process system" which he regarded as being housed in a "structure of brick and mortar" and made only two references to items being bolted down—the conveyors and the evaporator-condenser on the roof.

The value ascribed to the items found to be fixtures are those furnished by Mr. Gerner in his testimony as "in-place" valuations; except for the Bally freezer for which Mr. Neils opinion of value is adopted. The Trustee had accepted Mr. Gerner's method of valuation in preparing for sale and the Court, after hearing and observing Mr. Gerner testify, has no reason to do otherwise.

Other evidence on the record as to the fixtures came from the deposition testimony of Mr. Robert May who had been President and Operation Manager of Schwen's prior to the sale of equipment for Mr. Levy, and who died in the summer of 1977. Mr. May's testimony established the large items involved here were "free standing" and lacked any attachment at all to the building. He recalled that one ice cream freezer was attached to the floor with screws which were easily removed. He also testified as to other specific items and that "basically all the equipment was free standing equipment that attached to other pieces of equipment." He testified that the homogenizers, ice cream carton fillers, were electric plug-in units, that the pumps were portable and movable from tank to tank.

Defendant Levy introduced testimony of Mr. Heller, a man who has been involved in the ice cream manufacturing business for most of his life. He has managed ice cream plants and has closed and liquidated such plants. His family and he have had life-long ties to dairy businesses. He testified impressively about ice cream manufacturing equipment and dairy equipment, how it is readily dismantled and removable from plants. He testified that in the ice cream manufacturing industry, plant equipment is regarded as personal property and not as part of the building in which it may be installed. A sales brochure for a sale of a plant operated by Mr. Heller was introduced in evidence and is helpful to the Court in that it contains illustrations of similar or identical items to those the Court is dealing with here. The pictures are informative and assist the Court in understanding the testimony of the witnesses as to the manner of "hook up" of the separate items to one another.

Most of the production items of equipment were interconnected with stainless steel pipe for transfer of milk and other basic ingredients for making ice cream. None of the articles were connected to the building structure with the exception of the roof condenser unit and the conveyors which were fastened by bolts to give stability during operation. The Court cannot conclude from Mr. Gerner's testimony that any of the articles in question were in any meaningful way attached to the premises other than by weight and utility service hook ups, and although some of the tanks were large in bulk there is no evidence to indicate that they were immovable so as to be considered affixed by dint of sheer weight alone. It is true that an interior "false wall" had been partially removed to facilitate the removal of two large milk tanks. The wall was not a structural or bearing wall. It was less of a wall than the outside wall Mr. Weiderholt had partially removed some years earlier for the purposes of making an opening to deliver a piece of equipment into the manufacturing operation. This Court in the past has had occasion to rule that a large bulk milk storage tank is not a fixture even when it was necessary to remove and replace a wall to remove the old tank and set the new one in place.

Mr. May testified in deposition that the wall in question was constructed after the tanks were in place to seal off the production area in back of the tanks from the open dock area. Had a timely claim been made to repair the wall, the Court would have at the time unquestionably directed that be done.

The Claimant's evidence as to annexation presented in this case came mostly from the testimony of Ray Gerner, a specialist in dairy equipment new and used, who had visited the Schwen's plant twice in the summer of 1975 for the express purpose on both occasions of evaluating the Schwen's equipment; the first time as part of a sales presentation with the expectation of possibly replacing present equipment with newer equipment, and the second time at the request of Mr. May, the Operating Plant Manager of the plant, to give valuations of the equipment then in use. The very fact the owner-mortgagor was contemplating replacing about $70,000.00 worth of operating equipment with new equipment to modernize the production line to cut costs and improve margins to keep the company going leads the Court to infer that the owner-operator never intended the plant processing equipment to be part of the building. Mr. Gerner had good recollection of the Schwen's operation and had notes and diagrams to refresh his recollection as to locations in the plant and method of connection. It is obvious to the Court that Mr. Gerner viewed the equipment in the Schwen's plant as a "production process" from the receiving of the bulk milk, the mixing of the ingredients, pasteurizing, cooling, freezing, packaging the product and finally storage for shipment, and when specially asked he declined to state that any of it was attached to the building.

The Court has taken into consideration in determining the articles not be fixtures the intent evidenced by the owner-mortgagee in 1966 in asking for an appraisal of the company with the assets broken down into categories of buildings, land, building equipment and plant equipment. The purpose of that appraisal was for insurance purposes and it was important that all assets be properly classified. The Patchin Appraisal Company identified the King Sharpe freezers and condenser coolers in the cooler room as part of the building construction—all other equipment in the plant was listed as personal property.

The appraiser was asked to make another appraisal in 1974, the year the second mortgage was granted and was similarly instructed to appraise only the land and building. That appraisal treated several items sold by the Trustee as part of the building construction (the Bally freezer, King Sharpe freezer and condenser coolers) but all the other articles of equipment were omitted from the appraisal. The Court also considers that on the financial records of the company, the plant equipment was kept separate from the land and building for

valuation purposes. The listing by the Bankrupt in the Schedules of its property, required to be filed by the Bankruptcy Act, of the land and building in the real estate schedules and a three page detailed list of "personal property" under the Personal Property Schedule was further indicative of the owner's intent with respect to the status of the production equipment.

Before turning to the application of Minnesota law of fixtures to the above fact situation, the Court will comment on the Claimant's contention throughout this litigation and in its post trial brief that the Schwen's building was a "single purpose building"—that is, a building suitable only for the manufacture of ice cream.

The Court notes that Claimant relies on an unfounded assumption that the Schwen's building was a *"single purpose building"* and urges that without the manufacturing equipment the building would be an imperfect, or incomplete, building. This assumption merged with adoption of the *"Industrial Plant Doctrine"*, would make unnecessary evidence Claimant has failed to supply as to sufficient attachment and intent and purpose for installing the equipment initially. With the criteria of attachment and "intent" of the owner-mortgagor removed, the remaining rationale is simply that this building can be used only for manufacturing ice cream and, therefore, the machinery is part of the building. Having arrived at this point, Claimant can thus logically argue that Levy made a gross error in removing or even thinking he could remove any of the equipment without taking away part of the freehold.

Single purpose buildings are specially built or altered with specially designed or fitted equipment the removal of which would render the building useless for any alternative use. If the Court were to concede, as Benz has consistently urged, that the Schwen's building was a "single purpose building" then this Court could plausibly adopt Benz's approach to fixtures in this case. But the Court as the trier of fact, rejects out of hand the idea that the Schwen's building was a single purpose building—even Benz's own witnesses, Weiderholt and Pingrey, testified that it had alternate uses. The building was not specially built or altered for Schwen's purposes.

Benz would fuse together its single purpose theory with the concepts of the *Pennsylvania Industrial Use Doctrine* and introduce a variation to the Minnesota law of fixtures as it now exists.

Cases in which a similar question as to fixtures have been considered are numerous. That machinery and equipment is in use in a going concern has caused particular concern to the courts in reviewing the law of fixtures. The state courts are not agreed as to the legal status of items of machinery, for while the policy of some is to treat them as personal property wherever the intention of the parties will permit, other courts are disposed to regard them as affixed to the realty. (*Thompson on Real Property*, 1980 Ed., Vol. 1, Section 67) It is for this reason strict adherence to Minnesota law in this case is required.

The rules for determination here are the rules laid down by the courts of the State of Minnesota. No statute defines fixtures as distinguished from personal property. This Court must look to the decisions of the Minnesota courts to find the distinction and to guide its decision. A study of those decisions reveals certain rules of determination. Many picture the difficulty in applying the rules. *Edward R. Kenneally, Trustee v. Standard Electronics Corporation*, 364 F.2d 642 (8 Cir. 1966) sets forth the standards followed by the Bankruptcy Courts in Minnesota in dealing with questions of fixtures. While trade fixtures were the question in that case, the Eighth Circuit Court in discussing the Minnesota law of fixtures generally stated:

"It does not appear that the items were attached to the realty with a sufficient degree of permanence that the attachment alone would change the character of the property from personalty to realty. It has long been settled by the law of Minnesota that to constitute a fixture, in addition to the physical attachment,

many other factors must be taken into consideration, such as intent of the parties in making the annexation, the nature of the thing annexed, the adaptability to the use of the land and the end sought by annexation. " . . . the manner of annexation usually is not decisive but only one of several factors to be taken into account in determining whether the article loses its character as personalty and becomes a part of the realty." Citing Minnesota cases.

■ The nearest approach to a satisfactory definition of the term fixture is found in *Wolford v. Baxter*, 33 Minn. 12, 21 N.W. 744 (1844). The Minnesota Supreme Court there stated:

" . . . that in determining whether the article is personal property, or has become a part of the realty there should be considered the fact and character of annexation, the nature of the thing annexed, the adaptability of the thing to the use of the land, the intent of the party making the annexation, the end sought by annexation, and the relation of the party making it to the freehold . . . To make it a fixture, it must not merely be essential to the business of the structure, but it must be mechanically fitted, so as, in ordinary understanding to constitute a part of the structure itself. It must be permanently attached to, or the component part of, some erection, structure, or machine which is attached to the freehold, and without which the erection, structure or machine would be imperfect or incomplete."

Measured against this test, the Claimant's case cannot stand. It is Minnesota law which this Court must apply. Under the Pennsylvania "Industrial Use Doctrine" and the less stringent criteria of the other jurisdictions cited in Claimant's brief another result might be possible but it is not for this Court to lead the way in areas where the Minnesota Courts have already spoken. The Bankruptcy Courts follow the law of the state in which the dispute arises in such matters as is now before the Court.

■ The Plaintiff's argument in this case is built around a diverse collection of non-Minnesota cases which it views as expressive of the true law of fixtures or reflective of what the law need to be if this Court is to rule in the Plaintiff's favor on the fixtures issue. Minnesota law controls as to whether the Schwen's production equipment is "fixtures". The federal courts clearly recognize that state law is controlling on the issue of what constitutes a fixture for bankruptcy purposes. The Eighth Circuit Court of Appeals has agreed that the federal courts should normally look to local state law to determine what is or is not a fixture. The authorities note that courts within different jurisdictions differ greatly in this area of the law and for that reason it is all the more important to recognize that the decisions cited by Claimant rely on non-Minnesota law and are not in point. Minnesota does have a well developed law on the subject consistently requiring a showing of both annexation and intent. Merely because an item may be essential to the business being carried on in the structure, does not in itself make that item a fixture so as to pass with the title of realty such as it does under the "Doctrine of Industrial Use" so prevalant in the State of Pennsylvania. The "Doctrine of Industrial Use" has not been widely adopted in other jurisdictions. It has never been adopted in Minnesota.

In some jurisdictions there has been a tendency to place less stress on the manner of annexation and more upon the intention of the parties and the purpose for which annexation was made. Thus when it appears that equipment has been especially designed and installed in a building being especially designed to accommodate the site and the equipment and the whole has been acquired, constructed, and maintained for a particular purpose and used only for that purpose, such equipment will be considered a fixture even though the degree of annexation is not sufficient to meet the classic definition of a fixture as a chattel so annexed as to be irremovable without substantial damage either to the freehold or the fixture. In any event, there must, of

course, be some annexation without which the article would be purely personal property. On the other hand, if the article is so attached to the realty so as to be clearly attached (great weight or specially built-in fittings) less attention need be given to the factors of intention and purpose because the intent would be obvious in such a case. The "Industrial Use Doctrine" emphasizes purpose of use in an "industrial use" building and disregards the criterion of intent and manner of attachment.

The equipment here was not unique or peculiarly fitted for the Schwen's building—the whole set up could have been moved into another building with sufficient open floor space to accommodate it without altering in the slightest the structure of the building. Electrical conduit, water pipes, steam pipes, would have to be routed to accommodate the placement of the equipment. There is no evidence in the record that each item separately is connected to the power, steam and water service but to the contrary, the pieces are inter-connected so as to form a processing unit with the service sources affixed at certain points in the system. The testimony of Mr. Gerner and Mr. Heller that there is a ready after market for this type of equipment once it is removed from a building indicates that it adds no special value to the particular building it had been removed from.

The equipment as a whole in the Schwen's was not a fixture under Minnesota law. Minnesota recognizes that personal property may, under certain circumstances, become so annexed to the building as to become a part of the real estate. The question before this Court is to determine whether any specific items of personal property was in some way affixed or annexed to the building so as to be considered part of the building itself. Plaintiff has introduced no evidence that would support a finding by this Court that the processing equipment in Schwen's plant was actually affixed to the building or that any of it has become a component part of the building structure itself. It was free standing equipment held in place by its own weight or else definitely portable to be moved in the plant as needed. Several items used in the ice cream novelty manufacturing were leased equipment. The Trustee abandoned the estate interest and they were returned to the leasor when the plant was closed.

Plaintiff in its post trial brief introduces the interesting point of the "mortgagee's intention" with regard to this mortgage when it contends that Benz would not have given a mortgage for thousands of dollars having only the land and the building as its sole security. If that were a fact, Benz could have established it by testimony. The Court does not say that it would necessarily have accepted testimony as to the intent of the mortgagor or the mortgagee but at least some testimony with respect to the circumstances surrounding the granting of the mortgage would have been helpful to the Court. It was not the owner-mortgagor that initiated the placing of the mortgage against the assets of Schwen's property. It was Benz that coerced Schwen's to give it a promissory note and a mortgage as security to replace a long overdue account receivable in the amount of $50,000.00.

Benz in its brief states that it would not have accepted a mortgage on land and an empty building and thus interjects for consideration just what the mortgagee intended and could have reasonably expected to receive under its mortgage.

While cases have spoken about the mortgagor being in control to dictate what is or is not included in the mortgage, the opposite is true here. This is a situation where a creditor is forcing an insolvent debtor to grant a mortgage to secure what was then a long overdue account. No money passed from Benz to Schwen's at the time this mortgage was placed on the premises. It is inconceivable that Schwen's having ordered the appraisal to be made by Patchin of this land and building for purposes of determining possible refinancing possibilities did not discuss this valuation figure with Benz at the time the mortgage was given. The mortgage agreement was prepared for Benz by Norwood State Bank of Minnesota, a commercial lending institution, sophisticat-

ed in matters of taking security for debts and obligations, and the various sources of assets that are readily available for those purposes such as land and buildings, accounts receivable, and equipment and fixtures.

The Court may assume that inasmuch as Benz is now willing to accept as valid and correct Patchin's appraisal figure of $260,000.00 as the then market value of the Schwen's building as of September 1975, that when it took its mortgage in June 1974 it also then believed the land and building to be worth $260,000.00. On the basis of a five to one ratio of value to debt, Benz was amply secured for a debt amounting only to $50,000.00 covered by a building valued at $260,000.00 against which there was outstanding a minor encumbrance of $18,000.00 to People's Savings and Loan. In the absence of some other expressed agreement, it is reasonable to infer that Benz expected to receive a mortgage on land and buildings only as ample security for its $50,000.00 debt. A simple statement in the mortgage drafted by Benz would have avoided this dispute entirely.

Benz was the instigator of the mortgage transaction and this Court will not indulge any inference or assumption on its behalf with respect to what was intended to be covered or what it anticipated the mortgage to have covered. The Court concludes if, as is now contended by Benz that the mortgage covered more than the apparent land and buildings, it was Benz's responsibility to include appropriate language in the mortgage deed to clearly show that intent. In *Northwestern Mutual Life Insurance Co. v. George*, 77 Minn. 319, 79 N.W. 1028, the Minnesota Supreme Court posed a criteria for determining a mortgagees claim to personal property, what the mortgagee is entitled to expect when it parts with its consideration or what might a mortgagee reasonably expect his mortgage to cover in the absence of some agreement spelling out that expectation.

Evidence of what Benz might have expected by taking the mortgage on the Schwen's property in 1974 is the correspondence between counsel for People's and Schwen's in early December 1975 wherein counsel indicated that the Trustee's removal of equipment might have lessened the problem of stripping down the building that the mortgagees would face upon having the property returned to them. (Levy Exhibit 36)

In a landlord-tenant relationship the Trustee or Receiver in selling the assets would make an arrangement with the landlord to pay a rent for the use of the premises while a Receiver-Trustee occupies the premises for purposes of conducting sale. In this case, however, Levy was entitled by the right of redemption after the mortgage foreclosure to remain in possession of the property for a period of one year and thus no rental arrangement had to be made. Both the attorneys for People's and Schwen's were aware of this and they agreed between themselves to offer the estate the sum of $250.00 to get Levy to remove judgments against the premises and to surrender the estate's right of redemption from the mortgage foreclosure sale at an early date. This offer can hardly be viewed as consistent with the great value Claimant now places on the property.

In summary, the Plaintiff's claims of damages for conversion of plant equipment for the most part has not been sustained. The evidence fails to meet the long established test existing in Minnesota law relating to differences between fixtures and personal property. No proof was offered that any property alleged to be fixtures was affixed to the real estate other than by conventional ties to the source of electric, water and steam which are general services of the building and which connections are not sufficient modes of annexation to cause any person of ordinary understanding to believe that the ice cream making equipment was placed in the building for any reason other than for the purpose of making ice cream.

Giving full credit to the testimony of Claimant's witness, Ray Gerner, and the testimony of Mr. Heller, and taking into consideration the former testimony of Mr.

May whom the Court observed testifying under oath about Schwen's affairs in open court, under examination by the Court and hostile creditors, and the illustrations in the sale brochure of similar items of equipment in connection with the testimony of Mr. Heller, the Court concludes that the items claimed as fixtures by Benz are free standing articles inter-connected in some cases with stainless steel pipe with attending pumps and valves to make the product flow, wired to switch boxes in some cases and attached to water and steam lines in others, and where required hooked up to ammonia pipe. These slight attachments only keep them from being recognized as pure personal property. The attachment contemplated by law is more than merely occupying open floor space, it must be joined to the building in some firm way.

Schwen's was in the business of making ice cream to sell. That was the original purpose for which the equipment was put in the building. The Schwen's building in 1946 could have been used for any number of food oriented processing operations using cooler and freezer space, including dairy, locker, meat boning operation, cold storage for food products, as well as for ice cream manufacturing, butter and cheese operation. The machinery could have been removed and other operations could have been installed. The equipment was not indigenous to that building and at all times remained personal property.

## DAMAGES TO PREMISES

The second aspect of Claimant's case is the allegation that the Trustee negligently damaged the physical structure of the Schwen's plant in removing equipment and further damaged it by failing to heat the building thus permitting pipes to freeze and burst.

Counsel agree that *Rinkel v. Lee's Plumbing and Heating Company*, 257 Minn. 14, 99 N.W.2d 779 (1959) sets out the proper measure of damage for this case. Rinkel sets forth a two-prong test permitting recovery of the lesser diminution in fair market value or reasonable cost to repair dam-

age. Claimant here offered no evidence with respect to the reasonable cost to repair approach relying instead on the test of differences in valuation before and after the acts complained of. Claimant's witnesses referred to specific items of damage including partial removal of a false wall, openings left by removal of fans, opening in outer walls, burst water pipes, frozen heat exchange units, and destruction of interior wall partitions. Mr. Weiderholdt on behalf of the Claimant offered a general opinion that it would cost $38,000.00 to $50,000.00 to repair the damaged premises. However, he did not make specific reference to individual items of damage nor the cost to repair such, nor did he separate out in his opinion the damaged condition of the building which existed prior to the time that Schwen's filed its petition with this Court and that was substantial, nor the damages that occurred after the foreclosure sales. Hence, the Court will not speculate as to what specific items of damage occurred subsequent to the foreclosure sales and what the cost to repair them might be. However, there is sufficient evidence to show that the Bally freezer annex was removed after October 7, 1975. The other items enumerated in Findings of Fact No. 41 if they were removed were removed after October 7, 1975. The removal of those items after the foreclosure sale would be a form of waste. The question is the damages resulting from removal.

The Claimant's theory of damage with respect to the building is set out on page 37 of its post trial brief. The Claimant adopts the theory of damage measured by the difference, in value of the Schwen's property before and the value of the Schwen's property after the damage occurred. The Court recognizes the Claimant's choice of measure of damage and has applied that method in this case.

The Court recognizes the obvious, that damage was done to the premises during removal of the personal property and thereafter through failure to heat the premises. The only evidence as to when the items were removed is found in the testimony of

Levy and May. The wall came down in the early stage of the sale before the mortgage foreclosure sales of September 30, 1975 and October 7, 1975. During September and October 1975, the interior of the building was in disarray. It was not cleaned up after the sale but this does not equate with damage to the building and is not a relevant consideration.

The position of Benz must be put into perspective in order to understand the lack of tenability of the claim it now makes for damages to the real estate it now owns. First Benz did not acquire the real estate through action of the Bankruptcy Court. The Schwen interest passed under the Bankruptcy Act to the Trustee by operation of law subject, however, to valid liens of record. As of bankruptcy, Benz and People's had mortgages on the Schwen's real estate. The mortgages were in default and prior to bankruptcy foreclosure proceedings had been commenced under Minnesota Statutes on each mortgage. Both People's and Benz had valid liens on the land and buildings of Schwen's, as the Trustee recognized. The Trustee, if he deemed it to be in the best interest of creditors, could have paid People's and Benz and received satisfaction of their mortgages and the bankruptcy estate would have owned the property free and clear of all liens. Levy chose not to do so. Both People's and Benz applied to the Bankruptcy Court for permission to proceed with the foreclosure proceedings and since there was no objection by the Trustee, the Court granted its permission. Meanwhile, the liens of the mortgages continued in force unaffected by the bankruptcy proceedings. Under Minnesota law, the liens were for the full amount of the mortgage debts, interest, and costs of foreclosure proceedings. People's and Benz asked the Sheriff of Faribault County to sell the property to raise money to satisfy their claim. The People's sheriff's sale was first on September 30, 1975. The only bid was People's for $20,692.47. The Benz sheriff's sale was held October 7, 1975. .The only bid received was Benz's of $46,737.20. Each bid equaled the full amount of each mortgage debt including interest and expense of sale. In consequence of these bids the mortgage debt owed by Schwen's both to People's and to Benz was paid in full and the debt to Benz was extinguished. The Trustee then possessed the statutory right of redemption from the mortgage sale six months as to Benz and one year as to People's.

The purpose of a sheriff's sale on foreclosure is to determine the value of the property through competitive bidding. At a mortgage foreclosure sale, the mortgagee is expected to make a bid up to the amount of its mortgage debt plus cost and expense of the sale, since it would be useless to tender cash which would be immediately returned. If the mortgagee enters a bid for the full amount of the obligation owing to it together with costs and fees due in connection with the sale, he cannot recover damages for waste since he cannot establish any impairment of security, the lien of the mortgage having been extinguished by his bid and his security interest in the property terminated. Applied to the factual context of this case, the purchase by Benz of the property covered by the mortgage made by its bid accepted at the sheriff's sale, resulted in a total satisfaction of its secured obligation.

To the extent that asserted waste was committed prior to the foreclosure sale on October 7, 1975, Benz has no cause of action. Benz bid in at the sheriff's sale for the amount of its debt. Having satisfied its debt by bidding in the property, it cannot recover more. A mortgagee has an equitable interest in the mortgaged premises and may maintain an action against the mortgagor to prevent waste or damage to the land impairing his security at any time prior to foreclosure sale. It must be determined therefore, whether subsequent to the sheriff's foreclosure sale of September 30, 1975 and October 7, 1975, any waste was committed by Levy as Receiver-Trustee since to the extent such damage occurred it impaired the equitable-title interest of Benz in the property.

Benz after purchasing the Schwen property at the sheriff's sale had an equitable

interest which by statute would in one year ripen into fee title. Since evidence is lacking that freezing occurred prior to Levy's letter notice to Benz of December 18, 1975 of his intent not to heat the building the Court finds that Benz, not Levy, was responsible for heating the premises and any resulting damage from failure to heat cannot be charged to Levy.

Subsequent to the October 7, 1975 sheriff's sale, Levy sold and removed the Bally freezer annex from Schwen's land and the Court regards that as a form of waste diminishing the value of the property which Benz purchased at the sheriff's sale to which fee title had not completely passed to Benz. Levy in his representative capacity and the estate is responsible in damages for the resulting diminution of value of the real estate.

With respect to Claimant's broad assertion of vast damage to the property it purchased at the sheriff's sale, it must be noted that the personal property, the plant equipment, did not pass to Benz by the sheriff's certificate, only the title of the land passed to Benz. All the claim of Benz about its rights to land and building and a going, operating ice cream plant can only be measured from the date of the sheriff's foreclosure sale through which Benz ultimately derived its title. Benz at the sheriff's sale acquired the statutory right, to be vested with fee title one year later to that which it purchased October 7, 1975 from the sheriff at the foreclosure sale.

As noted, a mortgagee is not expected to bid any more for the property at the sale than the amount of its debt. That is all Benz did. However, it claims that what it bought and paid for on October 7, 1975 was worth considerably more than its bid and that after the sale Levy was in possession and he diminished the value of the property by selling fixtures and committing other acts which among other things damaged the walls of the plant.

A mortgagor has the right to remain in possession of real estate during the statutory one year redemption period following foreclosure sale, but at the end of that year the mortgagee is entitled to receive what he purchased at the sheriff's sale. Benz claims that it did not get what it had purchased from the sheriff because Levy had stripped the building of fixtures and otherwise damaged the building. In bidding in the property Benz is conclusively presumed to have taken it as it was and to have adjusted its bid accordingly. It matters not that Benz claims the land and building for which it paid $67,479.00 was worth $500,000.00, but it does matter that Benz must establish by sufficient proof that the expanded amount was the value on September 30, 1975 and October 7, 1975 when sold by the sheriff. The relevant dates in establishing the "before and after" value according to Plaintiff's theory of diminution of value are October 7, 1975, the date of the sheriff's sale and March 15, 1976 the date the Trustee surrendered the premises to People's. No other dates are relevant. The burden of proof is upon Benz to establish the values on those two dates.

Benz does not accept the premise that its measure of damage must be measured by the diminution, if any, in the value of the property from after the date of the foreclosure sale. While at trial Benz introduced an updated appraisal to show the value as of September 30, 1975, in its post trial brief it argues that August 1, 1975 is the date at which the "before" value should be determined. That date is completely irrelevant to determination of the issues in this case.

The Benz valuation figure is predicated upon the estimated value of the real estate as is set forth in the Bankrupt's schedules filed in these proceedings, in the amount of $260,000.00.

The Bankrupt's estimated value of its real estate is taken from an appraisal of its land and buildings ordered in March of 1974 and prepared by the Patchin Appraisal Company. Patchin Company assumed that because of the specially related refrigeration and cold storage improvements the highest and best use of the Schwen property was its then use as a plant for manufacturing ice cream. Patchin made its appraisal estimating the current market value in

place for continued use on the basis of cost replacement of the property.

Patchin employees visited the Schwen's premises in July of 1974 to establish the basis for its appraisal. They identified the property in their report on page 1:

"... appraisal covers the cold storage rooms and their related refrigeration equipment. Plant equipment, machinery, processing refrigeration, packaged coolers in Building # 1 and # 3, personal property, merchandise, consumable supplies, spare parts, inventories and net quick assets are excluded from this evaluation."

The aggregate of the assets constituting "Schwen's, Inc." in July of 1974 were in place and producing ice cream when Patchin visited the plant and made its 1974 appraisal.

Benz, anticipating trial, in 1979 asked Patchin, Inc., to do an update of its 1974 appraisal as of September 30, 1975. Mr. Neils, an employee of Patchin, Inc., and Claimant's witness, prepared the updated appraisal but did not visit the Schwen's premises in connection with preparing that updated appraisal. If he had done so he would have observed that the totality of Schwen's assets were no longer functional. The plant was closed, the employees discharged, personal property inventory and supplies had been sold, some production equipment had been sold, and the assets were under control of the Bankruptcy Court. The situation at Schwen's on September 30, 1975 does not equate with the situation existing on July 17, 1974. Mr. Neils has disqualified himself from giving an opinion of market value of the Schwen's property in 1975 since he assumed that the highest and best use of the premises was that of an ice cream manufacturing plant, which it was not then capable of being. Nor was Schwen's capable of being a continuing operation. Mr. Neils testified that no one told him of these matters when he was asked to prepare his appraisal, nor was he told that the Schwen business had been sold after the original appraisal was prepared in July of 1974. He does state that had he known of such events, they would have

made a significant difference in his evaluation of the premises. The Court as trier of fact is free to accept or reject the opinion of an expert witness. The Patchin updated appraisal prepared in 1979, submitted to the Court as evidence of the value of the Schwen's property as of September 30, 1975 is based on untenable assumptions and is without value in assisting the Court in determining the value of the Schwen property on October 7, 1975. Mr. Neils testimony lacked the forthrightness and candor the Court expects from an expert witness. The credibility of Mr. Neils appraisal report and his opinion of value are impaired by his manner and quality of testimony.

Mr. Pingrey and Mr. Rosenberg were other real estate experts testifying in this case but the testimony of neither bore directly on the value of the Schwen premises in October of 1975. The best evidence of the value of real estate is that for which it can be sold. Benz was willing to pay, and did pay, $67,479.00 for the fee title of the Schwen property and the Court considers that to be the best evidence of its market value as of October of 1975. It is in fact the only competent evidence of value as of that date in the record of these proceedings. Counsel for Levy and Lovett argue that the testimony of Pingrey and Mr. Swenson and certain documentary evidence indicate that a figure of $58,000.00 had been suggested by Benz to taxing authorities as the true market value of the Schwen property. However, that valuation was not asserted until eight months later in July of 1976. The Court does not feel it necessary or helpful to discuss the testimony of the other appraisers, Mr. Pingrey and Mr. Rosenberg, except to acknowledge that Mr. Rosenberg was a competent and straightforward witness. The testimony of Mr. Pingrey was in some respects credible and in other respects not.

The Court has indicated its conclusion that the Trustee did sell portions of the real estate for which the estate must respond in damages. The amount and manner of computation of such damage is set forth in the Findings of Fact and Conclusions of Law.

The Claimant has failed to sustain its burden of proof to establish its claim of damages of $328,014.00. The Court rejects the Neils update appraisals made in 1979 and during the trial as incompetent and without proper foundation and because its predicated date of July 1975 is completely irrelevant to determination of value in this case.

The Court accepts Mr. Neils opinion as to the value of the Bally freezer although based on mathematical extrapolation of the earlier 1974 appraisal figure. The testimony of Mr. Pingrey submitted by Claimant to establish the value of the premises as $31,-500.00 assumes an improper time and is not relevant to the determination of this Court. The Court measures damages in this case as the difference between the value at the time of the foreclosure sale when Benz acquired its right to the title to the real estate and the value at the time the Trustee surrendered the premises to the first mortgagor, People's Savings and Loan Association.

The Court is mindful of the Honorable Harry M. MacLaughlin's Order of June 6, 1980 which remanded to this Court for a further determination of fact. This Court, within the confines of the record made in these proceedings, has endeavored to carry out his mandate.